ROLAND M. and Miriam M.,
Plaintiffs, Appellants,

v.

The CONCORD SCHOOL COMMITTEE,
et al., Defendants, Appellees.

No. 89–2130.

United States Court of Appeals,
First Circuit.

Heard June 4, 1990.

Decided Aug. 3, 1990.

As Amended Aug. 8, 1990.

Rehearing and Rehearing En Banc
Denied Sept. 14, 1990.

David Berman, for appellants.

Richard N. Sullivan, with whom Kenney, Conley, Sullivan & Smith, P.C. was on brief, for appellees.

Before SELYA and SOUTER * Circuit Judges, and BOWNES, Senior Circuit Judge.

SELYA, Circuit Judge.

Appellants Roland and Miriam M. reside in Concord, Massachusetts, with Matthew M., their 15–year–old son. Matthew is

---

* Judge Souter heard oral argument in this matter, and participated in the semble, but did not participate in the drafting or the issuance of the panel's opinion. *See* 28 U.S.C. § 46(d).

"handicapped" within the meaning of the Education of the Handicapped Act, 20 U.S.C. §§ 1400–1485 (1982 & Supp. V 1987) (the Act). When a controversy arose over his educational course, the Bureau of Special Education Appeals (BSEA), an adjunct of the Massachusetts Department of Education (MassEd), ruled that the Concord School Committee (Concord) had offered Matthew an appropriate education, but ordered the parents reimbursed for certain interim expenditures. On an ensuing petition for judicial review, the federal district court upheld the qualitative finding and decided that appellants should defray all the contested expenses. We affirm.

## I. OVERVIEW

Through the medium of the Act, funds are allocated to assist the states in educating handicapped children. To receive federal money, a state must provide all handicapped children with "a free appropriate public education." 20 U.S.C. §§ 1400(c), 1414(b)(2)(A), 1416; see Burlington v. Department of Educ., 736 F.2d 773, 784–85 (1st Cir.1984) (Burlington II), aff'd, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985).

Substantively, the "free appropriate public education" ordained by the Act requires participating states to provide, at public expense, instruction and support services sufficient "to permit the child to benefit educationally from that instruction." Board of Educ. v. Rowley, 458 U.S. 176, 203, 102 S.Ct. 3034, 3049, 73 L.Ed.2d 690 (1982). While a state may not depart downward from the minimum level of appropriateness mandated under federal law, "a state is free to exceed, both substantively and procedurally, the protection and services to be provided to its disabled children." Burlington II, 736 F.2d at 792; see also 20 U.S.C. § 1401(18)(B). Some states have elected to go considerably above the federal floor. See, e.g., Burke County Bd. of Educ. v. Denton, 895 F.2d 973, 983 (4th Cir.1990) (North Carolina requires that opportunity be given to handicapped students to reach their "full potential commensurate with the opportunity given other children"). Massachusetts is such a jurisdiction: the

Commonwealth defines an appropriate education as one assuring the "maximum possible development" of the child. See Stock v. Massachusetts Hosp. School, 392 Mass. 205, 211, 467 N.E.2d 448, 453 (1984); see generally Mass.Gen.L.Ann. ch. 71B, §§ 1–14 (West 1982 & Supp.1990). Because state standards are enforceable in federal court insofar as they are not inconsistent with federal rights, David D. v. Dartmouth School Comm., 775 F.2d 411, 423 (1st Cir.1985), cert. denied, 475 U.S. 1140, 106 S.Ct. 1790, 90 L.Ed.2d 336 (1986); Burlington II, 736 F.2d at 789 & n. 19, we refer to, and consider, Massachusetts law where relevant in the pages which follow.

As a procedural matter, the Act commands that states and local education agencies (LEAs) like Concord "assure that handicapped children and their parents ... are guaranteed procedural safeguards with respect to the provision of free appropriate public education." 20 U.S.C. § 1415(a). The primary safeguard is the obligatory development of an individualized education program (IEP). Rowley, 458 U.S. at 181, 102 S.Ct. at 3038; Doe v. Defendant I, 898 F.2d 1186, 1189 (6th Cir.1990); see also 20 U.S.C. 1401(18); Mass.Gen.L. ch. 71B, § 3. That document compiles information and goals anent a particular student's educational progress. It must include statements about the child's current performance, long-term and short-term instructional targets, and objective criteria for measuring the student's advance. See 20 U.S.C. § 1401(19); 34 C.F.R. § 300.346 (1989).

Under the Act, mainstreaming is preferred. States must educate handicapped and non-handicapped children together "to the maximum extent appropriate," see 20 U.S.C. § 1412(5); Rowley, 458 U.S. at 202, 102 S.Ct. at 3048, and special education must be provided in "the least restrictive environment," see 34 C.F.R. § 300.552(d); Mass.Gen.L. ch. 71B, § 2; Mass.Regs.Code tit. 603, § 112.0 (1986). In Massachusetts, therefore, an IEP must address a handicapped student's needs "so as to assure his maximum possible development in the least

restrictive environment consistent with that goal." *David D.*, 775 F.2d at 423.

The development of an IEP requires the participation of a team of individuals, including the parents, the child's teacher, designated specialists, and a representative of the LEA. *See* 20 U.S.C. § 1401(19); 34 C.F.R. § 300.344; Mass.Regs.Code tit. 603, § 311.0. Once promulgated, an IEP must be reviewed annually and revised when necessary. *See* 20 U.S.C. §§ 1414(a)(5), 1413(a)(1), (11); 34 C.F.R. § 300.343(d); Mass.Gen.L. ch. 71B, § 3. If complaints arise, the state must convene "an impartial due process hearing." *See* 20 U.S.C. § 1415(b)(2). In the Commonwealth, this function is performed by the BSEA. Mass. Gen.L.Ann. ch. 15, § 1M (West Supp.1990). The hearing's outcome is reviewable in either state or federal court, and the reviewing tribunal has broad discretion to grant appropriate relief. *See Burlington*, 471 U.S. at 369, 105 S.Ct. at 2002; *Doe v. Brookline School Comm.*, 722 F.2d 910, 917–18 (1st Cir.1983); *Carrington v. Commissioner of Educ.*, 404 Mass. 290, 294, 535 N.E.2d 212, 215 (1989). The court's focus is upon the educational program which finally emerges from the administrative review process, not the IEP as originally proposed. *See Springdale School Dist. v. Grace*, 693 F.2d 41, 43 (8th Cir. 1982), *cert. denied*, 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 298 (1983).

## II. BACKGROUND

We summarize the factual underpinnings and procedural history of this dispute, presenting additional details as necessary in the course of our opinion.

Matthew has a number of disabilities, including difficulties with visual motor skills, visual perception, visual tracking, fine motor coordination, and gross motor coordination. He is easily distracted and has trouble maintaining and regaining concentration. Consequently, Matthew finds it hard to relate to peers and his real-world functioning is impaired. He often talks to himself, destroys nearby objects, proves unable to get himself ready for school, eats sloppily, and so forth. Nevertheless, he possesses normal intelligence and enjoys significant potential for academic progress.[1]

From kindergarten through fifth grade, Matthew attended the Concord public schools. He was placed in a self-contained classroom with other learning-disabled children. In June 1986, at the end of fifth grade, Matthew's parents unilaterally moved him to Landmark, a private residential school. Some three months later, when the new school year was about to start, the parents rejected Concord's 1986–87 IEP—which called for Matthew's continued placement in public school—instead enrolling him at Landmark for the school year. Concord did not consent.

■ At the parents' request, the BSEA undertook to determine Matthew's appropriate placement for 1986–87. It was not until June 1987 (after the school year had ended) that the decision was announced. Finding that Matthew's "major presenting problem" was a lack of socialization skills (rather than a learning disability *per se*), the BSEA, through its hearing officer, made a detailed comparison of Concord as opposed to Landmark, concluding that the former proposed a better program and that Matthew's needs were "not so severe as to dictate a residential placement." Hence, Concord's 1986–87 IEP was adjudged appropriate with the addition of a supplementary, after-school socialization component.[2]

---

1. The parents assail the district court's unwillingness to find that Matthew also "suffered from Attention Deficit Disorder." They base this assignment of error on the anticipated testimony of Dr. Kinsbourne, a neurologist. Because the district court did not err in excluding Dr. Kinsbourne's testimony, *see infra* Part V(A), we decline to address the so-called "divergent assessments" of Matthew's handicaps. *See Burlington II*, 736 F.2d at 793.

2. The socialization component had in fact been engrafted onto the IEP in January 1987. Such post-implementation adjustments are not inconsistent with a finding that the IEP is legally sufficient. *See Defendant I*, 898 F.2d at 1191; *Denton*, 895 F.2d at 978; *Rettig v. Kent City School Dist.*, 720 F.2d 463, 466–67 (6th Cir. 1983), *appeal dism'd, cert. denied*, 467 U.S. 1201, 104 S.Ct. 2379, 81 L.Ed.2d 339 (1984).

Although the BSEA acknowledged that Landmark was not the last agreed-upon placement, it nevertheless ordered Concord to reimburse appellants for first semester costs there.

Disappointed, the parents brought suit. In the district court, they assigned error to BSEA's determination that Concord was an appropriate placement and to its refusal to grant reimbursement of Landmark-related expenses for the complete 1986–87 school year. Concord cross-claimed against MassEd, contending that the BSEA exceeded its authority by ordering any reimbursement.

In the meantime, Concord duly convened a team to prepare Matthew's 1987–88 IEP. When issued on July 29, 1987, it proved to be much the same as the 1986–87 IEP. On August 28, Matthew's parents rejected it. The federal court action was stayed while the BSEA held another round of hearings. On August 19, 1988, through a second hearing officer, BSEA ruled that the 1987–88 IEP was substantively acceptable and that certain claimed procedural defects were excusable. The BSEA also found that Landmark's regimen was too restrictive and did not suitably address Matthew's capacity to be mainstreamed. The decision duly noted Matthew's progress at Landmark over the previous months—but the hearing officer remained "unconvinced that a nexus exist[ed]" between Matthew's improvement and his tenure at Landmark. Appellants thereupon amended the federal court complaint to embrace their assertion that the second BSEA decision was unfounded.

At a trial encompassing both school years, the district court accepted only the administrative record as evidence and prevented the parents from calling certain additional witnesses. After briefing and argument, the judge found that the suggested IEPs were appropriate. She therefore affirmed defendants' placement determinations for 1986–87 and 1987–88, but reversed the BSEA's order that Concord reimburse Landmark's fees for the first semester of the first school year.

## III. SCOPE OF JUDICIAL REVIEW

We divide this phase of our analysis into two segments, discussing separately the criteria which govern (1) the district court's review of the state agency's decisions, and (2) appellate review of the district court's judgment.

### A. Trial–Level Review.

■ In this type of case, the law demands that the district court:

> ... shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(e)(2). The court's principal function is one of involved oversight. "[T]he Act contemplates that the source of the evidence generally will be the administrative hearing record, with some supplementation at trial," and obligates the court of first resort to assess the merits and make an "independent ruling based on the preponderance of the evidence." *Burlington II*, 736 F.2d at 790; *see also Rowley*, 458 U.S. at 205, 102 S.Ct. at 3050; *Abrahamson v. Hershman*, 701 F.2d 223, 230 (1st Cir.1983); *Burlington v. Department of Educ.*, 655 F.2d 428, 431 (1st Cir.1981) (*Burlington I*). Nevertheless, the district court's task is "something short of a complete de novo review." *Colin K. v. Schmidt*, 715 F.2d 1, 5 (1st Cir.1983).

The required perscrutation must, at one and the same time, be thorough yet deferential, recognizing "the expertise of the administrative agency, ... consider[ing] the [agency's] findings carefully and endeavor[ing] to respond to the hearing officer's resolution of each material issue." *Burlington II*, 736 F.2d at 791–92. Jurists are not trained, practicing educators. Thus, the statutory scheme binds trial courts to give "due weight" to the state agency's decision in order to prevent judges from "imposing their view of preferable educational methods upon the States." *Rowley*, 458 U.S. at 207, 102 S.Ct. at 3051. Hence, the court must render

what we have called a "bounded, independent decision[ ]—bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court." *Burlington II*, 736 F.2d at 791.

■ Tracking the Act's two overriding concerns, the trial court's assessment of the IEP must address both procedural guarantees and substantive goals. The court must ask two questions:

> First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?

*Rowley*, 458 U.S. at 206–07, 102 S.Ct. at 3051. While the inquiry is necessarily as multifaceted as the Act, the sufficiency of the IEP remains the paramount concern: "The ultimate question for a court under the Act is whether a proposed IEP is adequate and appropriate for a particular child at a given point in time." *Burlington II*, 736 F.2d at 788; *see also Defendant I*, 898 F.2d at 1191.

## B. Appellate Review.

We have yet to address explicitly or in detail the standard by which the court of appeals should gauge the district court's ultimate determinations in cases under the Act. We do so today.

■ The question of whether an IEP is "adequate and appropriate" is a mixed question of fact and law. *Accord Lachman v. Illinois State Bd. of Educ.*, 852 F.2d 290, 293 (7th Cir.), *cert. denied*, 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 327 (1988); *Gregory K. v. Longview School Dist.*, 811 F.2d 1307, 1310 (9th Cir.1987). Like other mixed questions, measuring the adequacy and appropriateness of an IEP asks nisi prius to determine whether certain facts possess, or lack, legal significance in a given case. *See, e.g., Pavlidis v. New England Patriots Football Club, Inc.*, 737 F.2d 1227, 1231 (1st Cir.1984); *Sweeney v. Board of Trustees*, 604 F.2d 106, 109 n. 2 (1st Cir.1979) (collecting exam-

ples), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 733, 62 L.Ed.2d 731 (1980). In short, the district court is required to make an evaluative judgment, applying "a legal standard to a particular set of facts." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976).

Absent a showing that the wrong legal rule was employed, we have rather consistently taken the view that the district court's answer to a mixed fact/law question is reviewable only for clear error. *See, e.g., RCI Northeast Services Div. v. Boston Edison Co.*, 822 F.2d 199, 202 (1st Cir.1987); *Pavlidis*, 737 F.2d at 1231; *Sweeney*, 604 F.2d at 109 n. 2. Our past decisions under the Act have implicitly followed this approach. *See David D.*, 775 F.2d at 415; *Burlington II*, 736 F.2d at 790; *Colin K.*, 715 F.2d at 6; *Abrahamson*, 701 F.2d at 227; *Doe v. Anrig*, 692 F.2d 800, 808 (1st Cir.1982). Clear-error review seems peculiarly apt in the section 1415(e)(2) milieu, as gauging the adequacy and appropriateness of IEPs is a chore inevitably presenting "question[s] whose determination 'require[ ] delicate assessments ... [that] are peculiarly ones for the trier of fact.'" *New England Anti–Vivisection Soc., Inc. v. United States Surgical Corp.*, 889 F.2d 1198, 1203 (1st Cir. 1989) (quoting *TSC*, 426 U.S. at 450, 96 S.Ct. at 2132). The fact that district courts frequently decide these cases without live testimony, on the basis of the administrative record, does not detract from the wisdom of clear-error review. *See, e.g., Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (rationale underlying clearly erroneous rule applies unabated to findings "based ... on physical or documentary evidence"); *In re Tully*, 818 F.2d 106, 109 (1st Cir.1987) (clear-error standard applies "unconditionally to factfinding emanating from a 'paper' record"); *Custom Paper Prod. Co. v. Atlantic Paper Box Co.*, 469 F.2d 178, 179 (1st Cir.1972) (the "appellate function does not differ" because no witnesses testified in person). We hold that, in the absence of a mistake of law, the court of appeals should accept a district court's res-

olution of questions anent adequacy and appropriateness of an IEP so long as the court's conclusions are not clearly erroneous on the record as a whole.

■In the case before us, there was no "legal" error. The district court phrased the central issue as "whether the [IEP] addresses the child's special educational needs so as to assure his maximum possible development in the least restrictive environment consistent with that goal." We approve the court's articulation of the governing legal principle. We are relegated, therefore, to ascertaining if the court's ensuing determination that Concord's educational plans for Matthew were "adequate and appropriate" was clearly wrong.

## IV. ADEQUACY AND APPROPRIATENESS

■We come now to the heart of the matter: the sufficiency of the IEPs proposed by Concord, endorsed by the BSEA, and found satisfactory by the court below. On the premise that one should look before leaping, we deem it advisable to delineate the yardstick by which adequacy and appropriateness must be measured prior to confronting appellants' particularized challenges. We keep in mind that, in cases arising under the Act, the burden rests with the complaining party to prove that the agency's decision was wrong. *See Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir.1988); *Spielberg v. Henrico County Public Schools*, 853 F.2d 256, 258 n. 2 (4th Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 1131, 103 L.Ed.2d 192 (1989).

### A. The Yardstick.

■In storming these ramparts, appellants rely heavily on the particulars of Massachusetts' requirement that its special ed-

ucation programs "assure the maximum possible development" of handicapped students. *See* Mass.Gen.L. ch. 71B, § 2; *see also Stock*, 467 N.E.2d at 453. This substantive standard is admittedly higher than the federal "educational benefit" floor, *Burlington II*, 736 F.2d at 789, and makes the formulation and evaluation of IEPs a more complicated task in the Commonwealth than elsewhere. Be that as it may, the parents' claim that their son's academic progress at Landmark necessarily demonstrated the inadequacy of Concord's IEPs will not wash: even under the Massachusetts standard, a program which maximizes a student's *academic* potential does not by that fact alone comprise the requisite "adequate and appropriate" education. In a nutshell, appellants' *per se* approach is far too simplistic.[3]

■Let us be perfectly clear. Congress indubitably desired "effective results" and "demonstrable improvement" for the Act's beneficiaries. *Burlington II*, 736 F.2d at 788. Hence, actual educational results are relevant to determining the efficacy of educators' policy choices.[4] *See Defendant I*, 898 F.2d at 1190. But, appellants confuse what is *relevant* with what is *dispositive*. The key to the conundrum is that, while academic potential is one factor to be considered, those who formulate IEPs must also consider what, if any, "related services," 20 U.S.C. § 1401(17), are required to address a student's needs. *Irving Independent School Dist. v. Tatro*, 468 U.S. 883, 889–90, 104 S.Ct. 3371, 3375, 82 L.Ed.2d 664 (1984); *Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir.), *cert. denied*, 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983).

Among the related services which must be included as integral parts of an appro-

---

3. We take this proposition on appellants' terms, assuming *arguendo* that Landmark may have been an optimum academic environment. We note in passing, however, that the first hearing officer found Concord's program to be superior, *see supra* p. 988, and the second could fathom no substantial nexus between Matthew's academic progress and Landmark's curriculum, *see supra* p. 989.

4. Appellants pounce upon the district court's dictum that Matthew's progress at Landmark was "irrelevant to the question whether the Concord program was appropriate." Although the court's choice of terminology was infelicitous, the context, and other statements in the court's memorandum, make plain that the judge fully understood the evidentiary value of comparisons between Matthew's past and present academic progress.

priate education are "such development, corrective, and other supportive services (including ... psychological services ... and counseling services) as may be required to assist a handicapped child to benefit from special education." 20 U.S.C. § 1401(17); *see also* 34 C.F.R. § 300.13; Mass.Gen.L. ch. 71B, § 1 (defining special needs to be addressed by special education). So long as the means for doing so fit within the statutory compendium, the Act "require[s] that all of a child's special needs must be addressed in the educational plan." *Burlington II*, 736 F.2d at 788; *see also* 34 C.F.R. Pt. 300, App. C, Question 44 ("the IEP for a handicapped child must include all of the specific special education and related services needed by the child—as defined by the child's current evaluation"). Thus, purely academic progress—maximizing academic potential—is not the only indicia of educational benefit implicated either by the Act or by state law.

■ Moreover, appellants' argument misperceives the focus of an inquiry under 20 U.S.C. § 1415(e)(2): the issue is not whether the IEP was prescient enough to achieve perfect academic results, but whether it was "reasonably calculated" to provide an "appropriate" education as defined in federal and state law. *See Rowley*, 458 U.S. at 207, 102 S.Ct. at 3051; *Defendant I*, 898 F.2d at 1191; *Denton*, 895 F.2d at 980; *Colin K.*, 715 F.2d at 4. This concept has decretory significance in two respects. For one thing, actions of school systems cannot, as appellants would have it, be judged exclusively in hindsight. An IEP is a snapshot, not a retrospective. In striving for "appropriateness," an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was promulgated. *See* 34 C.F.R. Pt. 300, App. C, Question 38 (IEP's annual goals "describe what a handicapped child can reasonably be expected to accomplish"); *see also* 34 C.F.R. § 300.349. For another thing, the alchemy of "reasonable calculation" necessarily involves choices among educational policies and theories—choices which courts, relatively speaking, are poorly equipped to make. "Academic standards

are matters peculiarly within the expertise of the [state] department [of education] and of local educational authorities...." *Stock*, 467 N.E.2d at 455. We think it well that courts have exhibited an understandable reluctance to overturn a state education agency's judgment calls in such delicate areas—at least where it can be shown that "the IEP proposed by the school district is based upon an accepted, proven methodology." *Lachman*, 852 F.2d at 297. As Chief Justice (then Justice) Rehnquist has written:

> The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardians of the child.... In the face of such a clear statutory directive, it seems highly unlikely that Congress intended courts to overturn a State's choice of appropriate educational theories in a proceeding conducted pursuant to § 1415(e)(2).

*Rowley*, 458 U.S. at 207–08, 102 S.Ct. at 3051. Beyond the broad questions of a student's general capabilities and whether an educational plan identifies and addresses his or her basic needs, courts should be loathe to intrude very far into interstitial details or to become embroiled in captious disputes as to the precise efficacy of different instructional programs. *See Rowley*, 458 U.S. at 202, 102 S.Ct. at 3048; *Defendant I*, 898 F.2d at 1191; *Stock*, 467 N.E.2d at 455.

■ There is one final basis on which we reject appellants' *per se* argument. An IEP must prescribe a pedagogical format in which, "to the maximum extent appropriate," a handicapped student is educated "with children who are not handicapped.... 20 U.S.C. § 1412(5)(B); 34 C.F.R. § 300.550(b)(1). Congress' stated preference requires, in the eyes of both federal and state authorities, that education of the handicapped occur in "the least restrictive environment." *See* 34 C.F.R. § 300.552(d); Mass.Gen.L. ch. 71B, §§ 2, 3. Mainstreaming may not be ig-

nored, even to fulfill substantive educational criteria. "Just as the least restrictive environment guarantee cannot be applied to cure an otherwise inappropriate placement, similarly, a state standard cannot be invoked to release an educational agency from compliance with the mainstreaming provisions." *Burlington II,* 736 F.2d at 789 n. 19; *see also Roncker,* 700 F.2d at 1063 ("a placement which may be considered better for academic reasons may not be appropriate because of the failure to provide for mainstreaming").

Correctly understood, the correlative requirements of educational benefit and least restrictive environment operate in tandem to create a continuum of educational possibilities. *See Rowley,* 458 U.S. at 181 n. 4, 102 S.Ct. at 3038 n. 4; *Burlington II,* 736 F.2d at 785 n. 12; *Abrahamson,* 701 F.2d at 229 n. 10. To determine a particular child's place on this continuum, the desirability of mainstreaming must be weighed in concert with the Act's mandate for educational improvement. *See Lachman,* 852 F.2d at 296. Assaying an appropriate educational plan, therefore, requires a balancing of the marginal benefits to be gained or lost on both sides of the maximum benefit/least restrictive fulcrum. Neither side is automatically entitled to extra ballast.

For these reasons, then, comparative academic progress, in and of itself, is not necessarily a valid proxy for, or determinative of, the degree to which an IEP was reasonably calculated to achieve the mandated level of educational benefit.

## B. The Substantive Adequacy of the IEPs.

 The precepts we have just surveyed frame the inquiry facing the court below: the issue was not whether Concord's program was "better" or "worse" than Landmark's in terms of academic results or some other purely scholastic criterion, but whether Concord's program, taking into account the totality of Matthew's special needs, struck an "adequate and appropriate" balance on the maximum benefit/least restrictive fulcrum. On this issue,

the record sustains the district court's affirmative conclusion.

In the first place, the district court was bound to give "due weight" to the agency's judgment. *See Rowley,* 458 U.S. at 207. Second, the court obviously agreed with the BSEA hearing officers that Matthew required not only academic help but also socialization training and motor skills assistance. Having canvassed the evidence presented by Matthew's teacher, his parents, and the treating professionals, we cannot say that such a conclusion constituted clear error. As a matter of maximizing Matthew's educational benefit, those special needs were properly considered by the IEP team, notwithstanding the parents' rather singleminded focus on academic results. *See Hudson v. Wilson,* 828 F.2d 1059, 1063 (4th Cir.1987); *see also* Mass. Gen.L. ch. 71B, § 2. The IEP ensured socialization therapy with a psychologist and occupational therapy to improve Matthew's motor skills. Landmark's regimen provided no motor skills training and no specific program of socialization therapy. It follows that Concord could lawfully implement an educational plan which it reasonably considered more appropriate and well-rounded than the Landmark program, especially when its IEP explicitly provided for more, and better diversified, "related services" keyed to Matthew's specific handicaps. *See, e.g., Wilson v. Marana Unified School Dist.,* 735 F.2d 1178, 1182–83 (9th Cir.1984).

Additionally, appellants' imprecations all but ignore the mainstreaming requirement. Defendants' 1986–87 IEP proposed a non-residential day program in public school. The plan called for Matthew to be taught in both self-contained classrooms (i.e., with other handicapped students) and in regular classrooms, thus allowing increased mainstreaming in classes like social studies and science where he had attained an acceptable level of performance. In contrast, as a residential school catering to a learning-disabled clientele, Landmark posed a much more restrictive environment and afforded decreased prospects for mainstreaming.

Last but not least, there was considerable room for the BSEA, and the district court, to find that the advantages inherent in the IEP did not severely compromise educational benefits. Concord's teacher-student ratio was within the range recommended by two professionals who were treating Matthew (Drs. Cushna and Kinsbourne). Its faculty, by many measures, was more experienced and better credentialed than Landmark's. Matthew's progress from 1984 to 1986—a period which had been spent, for the most part, in the Concord public schools—was described by Dr. Cushna as "most astonishing." Although the evidence showed that peer interaction remained a persistent problem, Matthew had been making good academic progress and was gaining self-confidence during the interval immediately before his parents unilaterally changed his placement.

 In light of the evidence of Matthew's specific needs and the differences, plus and minus, between the IEP, on the one hand, and the Landmark program, on the second hand, there was substantial proof from which the state agency could rationally conclude that the IEP was adequate and appropriate. Mindful of this evidence, and the weight to be accorded agency determinations in cases under the Act, we cannot say that the district court erred in striking the balance of factors in favor of the BSEA's resolution of the question presented. Where the evidence permits two plausible views of adequacy/appropriateness, the agency's choice between them cannot lightly be disturbed.

To this point, we have discussed the 1986–87 IEP to the virtual exclusion of the 1987–88 IEP. Yet, what we have written about the former applies full bore to the latter. Because the parents insisted that Concord not reevaluate Matthew, the 1987–88 IEP was drafted along the same lines as the 1986–87 plan. It reflected a mixture of self-contained and heterogeneous classes, speech/language training, and occupational therapy. The 1987–88 IEP also included a substantial after-school socialization component designed to bring Matthew into contact with both handicapped and non-handicapped children. One new feature was a specific allotment of time to an academic tutorial program. The alternative—Landmark's program—remained substantially unchanged. For the same reasons as pertained in the previous year, the BSEA permissibly determined Concord's 1987–88 IEP to be appropriate and substantively adequate. The lower court's ratification of that finding was not clearly wrong.

## C. The Procedural Adequacy of the 1987–88 IEP.

 The scope of a district court's inquiry into a state's compliance with the procedural requirements of the federal Act encompasses not only the substance of special education, but also the adequacy of the process through which a particular IEP has been created. See *Rowley*, 458 U.S. at 206, 102 S.Ct. at 3050; *Burlington II*, 736 F.2d at 783, 787. In this case, appellants assert that certain procedural defects in the formation of the second IEP were so severe as to render it infirm.[5]

 We limn the guideposts. Courts must strictly scrutinize IEPs to ensure their procedural integrity. See *Defendant I*, 898 F.2d at 1190. Strictness, however, must be tempered by considerations of fairness and practicality: procedural flaws do not automatically render an IEP legally defective. See *id.* at 1191. Before an IEP is set aside, there must be some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits. See *id.*; *Denton*, 895 F.2d at 979, 982; *Burlington II*, 736 F.2d at 786.

 Appellants urge, without citation to competent authority, that the district court should have shifted the burden to Concord to demonstrate that the alleged

---

**5.** To the extent that appellants' procedural critique can be read as addressing the 1986–87 IEP, their complaints are both peripheral and insubstantial. We reject any such procedural challenge, express or implied, without extended comment.

procedural defects referable to the 1987–88 IEP were harmless. We disagree. Congress' special emphasis on the provision of procedural protections springs from the hope that an abundance of process and parental involvement will help ensure the creation of satisfactory IEPs acceptable to all concerned. *See Rowley*, 458 U.S. at 205–06, 102 S.Ct. at 3050; *Burlington II*, 736 F.2d at 783. Inasmuch as the caselaw makes manifest that the party allegedly aggrieved must carry the burden of proving that the educational agency erred in its substantive judgment, *see supra* p. 991 and cases cited, logic suggests that the burden be allocated in the same way when a party's attack is garbed in procedural raiment. The court below correctly imposed the devoir of persuasion on the complainants in respect to the harmfulness of the claimed procedural shortcomings. *See Kerkam*, 862 F.2d at 887; *Spielberg*, 853 F.2d at 258 n. 2; *Burlington II*, 736 F.2d at 794.

 Turning to specifics, appellants' complaints fall into two categories. In terms of output, they cite the use of computerized forms, the lack of a prioritized listing of Matthew's educational objectives, and the bareness of Concord's promise that Matthew would participate in further mainstreaming "when ready." In terms of input, they remonstrate that the IEP relied on information gathered from persons (1) not present at the team meeting, and (2) whose identities were not contemporaneously revealed. The district court concluded that the asserted "procedural defects in the preparation of the 1987/88 IEP taken together were not sufficient to render the IEP inadequate." The conclusion seems unimpeachable.

We believe it is important that, during the team meeting, appellants were given all the information that was ultimately used to fashion the IEP. Such disclosure was plainly sufficient to alleviate any potential problem stemming from the use of preprinted forms or the cursory nature of Concord's comments. *Cf., e.g., Defendant I*, 898 F.2d at 1191 ("Adequate parental involvement and participation in formulating an IEP ... appear to be the Court's primary concern in requiring that procedures be strictly followed."). While personalized detail will always be helpful in evaluating an IEP, we decline the invitation to bar LEAs from using standard forms or to insist that every conclusion and prediction contained in an IEP be exhaustively and explicitly documented.

As to input, Massachusetts envisions that the team which writes an IEP will include a "teacher who has recently had or currently has the child" as a student. Mass.Reg.Code tit. 603, § 311.2. The regulations also provide for input from, *inter alia*, attending psychologists. *Id.* § 311.6. Neither Matthew's teacher at Landmark nor the psychologist retained by the parents, Dr. Cushna, attended the team meeting. Yet, while all contributors to the IEP's formation were not at the meeting or identified at that time, the shortfall in attendance seems more attributable to parental reticence than to defendants' errors. The parents, not the school committee, had a relationship with Landmark and with the psychologist. They had removed Matthew from the Concord schools and had specifically asked Concord to refrain from independently testing the child. Thus, the LEA, by virtue of appellants' actions, was in a perilously poor position to remedy the omissions. The law ought not to abet parties who block assembly of the required team and then, dissatisfied with the ensuing IEP, attempt to jettison it because of problems created by their own obstructionism.

Further pursuit of this subject would be supererogatory. Particularly in the face of (1) the parents' studied lack of cooperation with ongoing attempts to develop the 1987–88 IEP, and (2) the lack of any indication of "procedural bad faith" on appellees' part, *see Burlington II*, 736 F.2d at 783, we are satisfied—as was the district court—that Concord fulfilled the essence of its procedural responsibilities. *Compare, e.g., Denton*, 895 F.2d at 982.

## V. REFUSAL TO RECEIVE ADDITIONAL TESTIMONY

 The Act tells a reviewing court that it "shall receive the records of the

administrative proceedings [and] shall hear additional evidence at the request of a party...." 20 U.S.C. § 1415(e)(2). Relying on the general force of this imperative, appellants calumnize the district court for refusing to allow three expert witnesses (Drs. Marcus, Cushna, and Kinsbourne) to testify at trial. The ban, appellants say, invalidates judicial approval of the 1987–88 IEP. Despite appellants' extravagant hyperbole, we think the court's exclusionary order, grounded on the finding that the parents' lawyer "had deliberately withheld that testimony at the administrative hearing," was supportable. Nor did the handling of the matter at the agency level demonstrate an impermissible bias.

### A. Basis for Refusal.

The facts are these. Dr. Kinsbourne (a pediatric neurologist) and Dr. Cushna (Matthew's attending psychologist) treated Matthew at least since early 1987. Both men testified in the first round of BSEA hearings, devoted to the 1986–87 IEP. Dr. Marcus, a specialist in child psychiatry, began caring for Matthew in the fall of 1987. All three doctors were treating him when the second set of BSEA hearings, devoted to the 1987–88 IEP, commenced. Appellants' lawyer indicated that he would squirrel the witnesses away until the court trial. The hearing officer implored counsel to adduce the witnesses' testimony and warned him against undermining the administrative process.[6] Despite this request and warning, appellants steadfastly refused to produce the experts, citing an avowed distrust of the BSEA proceedings. Concord tried to subpoena them, but only Dr. Marcus responded. He testified over the parents' protest.

When the case went before the district court, appellants wanted to have this trio of witnesses testify. Defendants objected. The judge granted their motion *in limine.*

Appellants claim that preclusion was unwarranted.

■ We start with bedrock. A court's customary discretion in evidentiary matters is channeled by the special goals and procedures of the Act. *See Burlington II,* 736 F.2d at 791. As a means of assuring that the administrative process is accorded its due weight and that judicial review does not become a trial *de novo,* thereby rendering the administrative hearing nugatory, a party seeking to introduce additional evidence at the district court level must provide some solid justification for doing so. To determine whether this burden has been satisfied, judicial inquiry begins with the administrative record. A district court:

> should weigh heavily the important concerns of not allowing a party to undercut the statutory role of administrative expertise, the unfairness involved in one party's reserving its best evidence for trial, the reason the witness did not testify at the administrative hearing, and the conservation of judicial resources.

*Id.*

Here, the parents were given every opportunity to present the desired testimony at the administrative level. They flatly refused. The unfairness of appellants' gambit is patent—as is the potentially insidious effect of rewarding such a maneuver. In its wisdom, Congress prescribed a two-tier model for these cases. To allow litigants to husband their witnesses, arbitrarily withholding them from the administrative process, would effectively sabotage the statutory scheme.

The hearing officer, echoing these concerns, found categorically that there was no good reason why the witnesses were not brought forward; appellants' strategy was based on an "intent to withhold relevant evidence from the administrative hearing, to demean the statutory role of administrative expertise, and to bypass the due pro-

---

**6.** The hearing officer referred to Drs. Cushna and Kinsbourne as "witnesses that should be brought forward before this hearing officer so that this hearing officer as ... the recognized expert in conducting these matters has the opportunity to have the full picture of this child's needs before her...." The hearing officer spe-

cifically warned appellants against any "attempt to undercut the power of the hearing officer by not presenting all the witnesses at this time, and subsequently saving ... best witnesses for court, those witnesses being whoever the child is seeing for treatment if in fact the child is in treatment...."

cess framework generated by federal and state provisions" in order to reserve the evidence for a judicial trial. Before us, and below, the parents conceded that the core element of this finding was true: they deliberately withheld the witnesses from the second round of BSEA proceedings, preferring to use them in court. And they have come forward with no convincing explanation why their game of cat-and-mouse should have been countenanced or the evidence admitted in the district court.[7]

We refuse to reduce the proceedings before the state agency to a mere dress rehearsal by allowing appellants to transform the Act's judicial review mechanism into an unrestricted trial *de novo*. Where parties could have, but purposely chose not to, call certain witnesses at the administrative hearing, the district court has discretion to exclude the testimony on judicial review. *See Burlington II,* 736 F.2d at 790 (it is "an appropriate limit in many cases ... to disallow testimony for all who did, *or could have*, testified before the administrative hearing") (emphasis supplied); *accord A.W. v. Northwest R-1 School Dist.,* 813 F.2d 158, 165 (8th Cir.), *cert. denied,* 484 U.S. 847, 108 S.Ct. 144, 98 L.Ed.2d 100 (1987); *School Bd. of Prince William County v. Malone,* 762 F.2d 1210, 1218 n. 12 (4th Cir.1985). In the absence of special circumstances, courts should ordinarily exercise that discretion in favor of excluding the belatedly offered evidence.[8]

To be sure, district courts are empowered to hear testimony not presented before the state agency. Yet, that power is a hedge against injustice. Injustice cannot credibly be claimed when, as here, parties willfully elect to leapfrog the agency proceedings. While "the legislative history of the Act reflects the understanding that exhaustion is not a rigid requirement ... litigants are discouraged from weakening the position of the agency by flouting its processes." *Ezratty v. Puerto Rico,* 648 F.2d 770, 774 (1st Cir.1981); *see also Leonard v. McKenzie,* 869 F.2d 1558, 1563 (D.C. Cir.1989) (declining to entertain issue not raised before hearing officer); *David D.,* 775 F.2d at 424 (same). Counsel's unfounded disdain for the administrative process, without more, cannot persuade us to ignore both our own precedents and the elaborate protocol mandated by Congress. We discern no abuse of the lower court's sound discretion in this situation.

## B. Alleged Bias.

Appellants also complain that the second hearing officer's response to their embargo on expert testimony revealed an impermissible conjunction of investigative and adjudicative functions, and that the decision was so infected by the hearing officer's bias against their counsel that it should have carried little or no weight in the district court. This bias, appellants say, violated both their constitutional right to due process and their statutory right to "an impartial due process hearing" under 20 U.S.C. § 1415(b)(2).

We find no merit in these expostulations. The hearing officer's response to counsel's vexatious attitude was not only justified, but entirely proper. There is nothing to

---

7. Contrary to appellants' jeremiad, "double witness fees" were not a legitimate consideration. Had the parents complied with the usual praxis, their witnesses' testimony would have been presented live before the administrative tribunal, and made fully available to the district court by transcription. Only one set of witness fees would have been incurred.

8. In an effort to show special circumstances, appellants claimed below that all three witnesses would have testified about the harmful effects of a mid-year transfer on Matthew. Because the BSEA's "equitable division" of the 1986–87 school year for purposes of reimbursement could not have been anticipated at the original hearings, and the second round of hearings was restricted to the 1987–88 IEP, appellants argued that their only chance to present this evidence was at trial. Although that conclusion is true as a matter of timing, it overlooks that the initial BSEA decision was designed only as a means of dividing the costs of the 1986–87 school year, not as a finding that Matthew's placement should actually have been altered midstream. In any case, the claim appears to have been abandoned on appeal. *See United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.) (issues adverted to in passing, without any attempt at developed argumentation, are waived), *cert. denied,* — U.S. —, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990).

indicate that the hearing officer based his decision on actual bias or hostility toward the parents or their counsel. *Cf., e.g., Beauchamp v. De Abadia,* 779 F.2d 773, 776 (1st Cir.1985); *O'Brien v. DiGrazia,* 544 F.2d 543, 547 (1st Cir.1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977). The record is similarly barren of any credible suggestion that the hearing officer prejudged facts, *cf. Withrow v. Larkin,* 421 U.S. 35, 49, 95 S.Ct. 1456, 1465, 43 L.Ed.2d 712 (1975), or that the BSEA's administrative structure posed "an unacceptable risk of bias," *id.* at 54, 95 S.Ct. at 1468. The parents' attorney was permitted to present evidence, examine witnesses, argue, and object—prerogatives which he exercised vigorously. When asserted, objections were fully considered. When rejected, explanations were generally given. No more was required. *See Holt v. Virginia,* 381 U.S. 131, 136, 85 S.Ct. 1375, 1378, 14 L.Ed.2d 290 (1965); *In re McConnell,* 370 U.S. 230, 236, 82 S.Ct. 1288, 1292, 8 L.Ed.2d 434 (1962); *Collins v. Marina-Martinez,* 894 F.2d 474, 480 (1st Cir.1990). The parents' procedural rights, constitutional and statutory, were carefully protected in the conduct of the administrative hearings.

## VI. REIMBURSEMENT

Despite her explicit finding that the Landmark program was inappropriate for Matthew, the first BSEA hearing officer decided that the parents were nonetheless "entitled to be reimbursed for the Landmark day component including the after school activities, from September through January 1987." The hearing officer based her ruling on appellants' stated confusion over the formulation of the 1986–87 IEP and Matthew's teacher's recommendation to them that Landmark would be an advantageous placement.[9] When answering the parents' complaint, Concord filed a cross-claim against MassEd, asserting that the

reimbursement order was improper. The district court agreed. Appellants challenge both the timeliness of the cross-claim and the substance of the court's refusal to order reimbursement.

### A. Timeliness.

■ The BSEA rendered its final decision anent the 1986–87 IEP on July 24, 1987. Appellants filed suit in district court on August 21, 1987. On September 10, the parents and Concord filed the first of three successive stipulations enlarging the time to "answer or otherwise respond" to the complaint. When Concord eventually answered on December 11, within the time prescribed by the last of the extensions, it asserted a cross-claim against MassEd challenging the order for partial reimbursement. The parents, despite their acquiescence in the serial late-entry stipulations, now maintain that the cross-claim was time-barred.

In the absence of an explicit federal limitation, some courts have looked to analogous state statutes to determine when actions under 20 U.S.C. § 1415(e)(2) are time-barred. *See, e.g., Spiegler v. District of Columbia,* 866 F.2d 461, 463–64 (D.C.Cir. 1989) (cataloguing cases); *Department of Educ. v. Carl D.,* 695 F.2d 1154, 1157 (9th Cir.1983). Appellants argue that the Commonwealth's 30–day limit for appeals from administrative actions, Mass.Gen.L.Ann. ch. 30A, § 14(1) (West 1979), ought to apply to Concord's cross-claim. In our judgment, the asseveration offers too little and comes too late.

During the period this case was pending below, appellants filed a pretrial memorandum which did not raise, or question, the timeliness of the cross-claim. When the district court issued its final pretrial order specifying what was before the court for adjudication, *see* Fed.R.Civ.P. 16(d), (e), timeliness was not listed as a justiciable issue. Appellants did not object to entry of

---

**9.** Although we doubt whether such informal advice can ever bear the weight of supporting a reimbursement remedy, *see, e.g.,* 34 C.F.R. Pt. 300, App. C, Question 11 ("If a child's teacher(s) feels that the child's placement or IEP services are not appropriate to the child, the teacher(s)

should follow agency procedures with respect to (1) calling or meeting with the parents and/or (2) requesting the agency to hold another meeting to review the child's IEP."), we need not decide that question today.

the order. They never moved to amend it. They raised the timeliness defense for the first time in their trial memorandum, filed on the eve of oral argument in the district court. The court, understandably, ignored the eleventh hour attempt to revivify a moribund issue.

The Civil Rules are plain enough: once entered, the final pretrial order "shall control the subsequent course of the action" and "shall be modified only to prevent manifest injustice." Fed.R.Civ.P. 16(e). It is, therefore, widely recognized that issues not included in the final pretrial order are waived. *See, e.g., Ramirez Pomales v. Becton Dickinson & Co.*, 839 F.2d 1, 3 (1st Cir.1988); *Petree v. Victor Fluid Power, Inc.*, 831 F.2d 1191, 1194 (3d Cir.1987). The principle is easily explicable. Pretrial orders are valuable accouterments to the judicial process. They define, simplify, and limit the issues to be decided, reduce error, prevent surprise, promote judicial economy, and encourage settlement. *See Brook Village North Assocs. v. General Elec. Co.*, 686 F.2d 66, 71 (1st Cir.1982); 3 J. Moore, Moore's Federal Practice, ¶ 16.03 at 16–20 to 16–21 (2d ed. 1989). If pretrial orders are to continue to serve these laudable ends, courts and litigants must ordinarily take them seriously. A final pretrial order should say what it means and mean what it says.

██ Where, as here, a district court chooses to stand firm on its final pretrial order, it behooves the court of appeals to "exercise minimal interference," intervening only if the lower court's "broad discre-

tion to preserve the integrity and purpose of the pre-trial order" has been badly mismanaged. *Ramirez*, 839 F.2d at 3; *see also Farr Man & Co. v. M/V Rozita*, 903 F.2d 871, 876 n. 4 (1st Cir.1990); *Sexton v. Gulf Oil Corp.*, 809 F.2d 167, 170 (1st Cir.1987). When a litigant tardily seeks to bring a new issue in from the cold, the reasons for changing the syllabus and whether prejudice may result are factors which inform the district court's discretion. *See Petree*, 831 F.2d at 1194; *Sexton*, 809 F.2d at 170. In this instance, those factors counsel that we uphold the district court's refusal to consider the question of timeliness. The planned defense did not surface in appellants' armada until the verge of final argument. The parents point to nothing in the record which might satisfactorily explain their failure to preserve the defense. The prejudice to Concord, had the district court reached beyond the agreed issues, is obvious. Under the circumstances, we find no abuse of discretion. The defense was waived.[10]

**B. Propriety of Reimbursement.**

██ Reimbursement is "a matter of equitable relief, committed to the sound discretion of the district court." *Burlington II*, 736 F.2d at 801; *see also Brookline*, 722 F.2d at 921. Though the courts possess extensive powers to tailor remediation to meet the exigencies of specific cases, reimbursement is usually reserved for parties who prevail at the end of a placement dispute.[11] *See Gregory K.*, 811 F.2d at 1315; *Burlington II*, 736 F.2d at 799 (noting "availability of equitable reimbursement to

---

**10.** Although we need not reach the issue, we remark that appellants probably were headed down a blind alley in attempting to peg the timeliness of Concord's cross-claim on an adscititious state statute of limitations. Given (1) that the district court seasonably acquired jurisdiction over the agency's entire final decision via the parents' timely appeal, and (2) that Concord merely disputed BSEA's attempt to employ an equitable remedy in fashioning that decision, the necessity for a separate cross-claim was dubious. At any rate, the timeliness of the cross-claim, if germane at all, was likely governed not by a statute of limitations but by the equitable doctrine of laches. *See, e.g., Interstate Commerce Comm'n v. B & T Transp. Co.*, 613 F.2d 1182, 1186 n. 6 (1st Cir.1980) (where party seeks

equitable relief not explicitly provided in regulatory scheme, court should apply equitable doctrines such as laches). Under such a test, the cross-claim would not have been time-barred. *See, e.g., K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 911 (1st Cir.1989) (discussing criteria for successful laches defense).

**11.** There are, of course, exceptions. In *Burlington II*, for instance, we held that parents who were actually reimbursed pursuant to an administrative order should not be forced to return the funds when a court later determined that reimbursement had erroneously been ordered. 736 F.2d at 800–01. In the instant case, however, *no payment was ever effected.*

a prevailing party as a general matter"). In the typical situation, "[r]eimbursement must be denied to the parents if the school system proposed and had the capacity to implement an appropriate IEP." *Burlington II*, 736 F.2d at 799.

As the case before us aptly illustrates, placement disputes may take years to wind their way through the administrative/judicial labyrinth. Pending completion of adversary proceedings, the Act mandates that "unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement...." 20 U.S.C. § 1415(e)(3). While the law does not require parents to keep a child in a program they feel is inappropriate, "it operates in such a way that parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of State and local school officials, do so at their own financial risk." *Burlington*, 471 U.S. at 373–74, 105 S.Ct. at 2004. Parents win the gamble if, and to the extent that, the placement they preferred is ultimately adjudged appropriate and the IEP inappropriate. *See id.*, at 370, 105 S.Ct. at 2002; *Brookline*, 722 F.2d at 921. Elsewhere, the costs arising out of a unilateral placement are not shifted.

■ Applying these tenets, the district court acted lawfully in reversing the partial reimbursement order. The BSEA stated, supportably, that Landmark was "not [to] be considered the last agreed upon placement" for the purpose of section 1415(e)(3). Therefore, Matthew's parents bore the financial risk of paying Landmark's tuition if they failed to show that Concord's IEP was inappropriate. *See Burlington*, 471 U.S. at 374, 105 S.Ct. at 2004 ("If the courts ultimately determine that the IEP proposed by the school officials was appropriate, the parents [are] barred from obtaining reimbursement for any interim period in which their child's placement violated § 1415(e)(3)."); *Burlington I*, 655 F.2d at 433. The court below did no more than implement this well settled principle.

## VII. CONCLUSION

We need go no further. To recapitulate, the district court did not err in determining that Concord's IEPs were prepared with sufficient procedural safeguards and provided an adequate and appropriate educational plan for Matthew. By the same token, the district court did not misuse its discretion in barring the proffered testimony of witnesses deliberately withheld at the administrative level or refusing to upset the second BSEA decision on the ground of bias. And appellants were not entitled to be reimbursed for any part of the costs stemming from their son's unilateral enrollment in a private residential school since Concord had offered—and the parents had spurned—an adequate, appropriate public education. Finding no legally significant error, substantive or procedural, in these or any other respects, we reject the instant appeal.

*Affirmed.*