# United States Court of Appeals
## For the First Circuit

_____

No. 00-1746
No. 00-1763
No. 00-1870

ROME SCHOOL COMMITTEE,

Plaintiff, Appellee,

v.

MRS. B.,

Defendant, Appellant.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, <u>U.S. District Judge</u>]

_____

Before

Boudin, <u>Circuit Judge</u>,
Bownes, <u>Senior Circuit Judge</u>,
and Lynch, <u>Circuit Judge</u>.

_____

Richard L. O'Meara, with whom Krista N. Everly and Murray, Plumb & Murray were on brief, for appellant.
Eric R. Herlan, with whom Drummond Woodsum & MacMahon was on brief, for appellee.

_____

April 26, 2001

_____

**LYNCH, Circuit Judge**.  This appeal is brought by Mrs. B., the mother of a troubled boy, DC, whom she placed in a private residential school in 1998 after rejecting the public school's proposed Individualized Education Plan.  That IEP instead proposed mainstreaming the child into the local school for the 1998-99 school year.  A hearing officer found the proposed IEP from the Rome School Committee for that year as well as the IEP proposed for the 1999-2000 school year to be inadequate under the Individuals With Disabilities Education Act, 20 U.S.C. §§ 1400-1491, and ordered Rome to reimburse Mrs. B. for the private school placement for those two years.

In the school system's suit challenging the hearing officer's determination, the district court concluded, as had the reviewing magistrate judge, that the hearing officer was wrong on the substance -- that the IEPs were adequate.  Nonetheless, the district court, following precedent that a parent may rely on the hearing officer's determination, held that Mrs. B. did not have to reimburse Rome for payments it had made for the tuition and related expenses in those two years.  See Town of Burlington v. Dep't of Educ., 736 F.2d 773, 800-01 (1st Cir. 1984) ("Burlington II"), aff'd, 471 U.S. 359 (1985).  This holding was independent of the holding on the adequacy of the IEPs.

Mrs. B. has appealed.  The school system has not.  And DC, apparently, continues at the private school, although we have nothing in the record on that point or on any later IEPs the school system may

-3-

have proposed.  The purpose of Mrs. B.'s appeal, in large part, is to be certain Rome cannot obtain reimbursement from her for the two school years, 1998-2000.  But there is no issue as to that, because Rome does not appeal.  Reimbursement is a different question than the merits of the IEPs.  Indeed, the IEPs proposed for the 1998-99 and 1999-2000 school years could have been adequate, but Mrs. B. still would not have to reimburse Rome the tuition money it paid for those years.  See Burlington II, 736 F.3d at 800-01 (school is estopped from seeking reimbursement from parent for school year covered by agency's decision ordering reimbursement).[1]  Because there is no controversy as to reimbursement, the adequacy of past IEPs is not before us.  There is a question, then, as to what remains before us.

We do not view the question of the IEP or the payment for the current school year (2000-2001) as properly before us, as all of the record evidence concerns a dispute about the prior two years.  Nonetheless, both parties assume that this court's view of the adequacy of the IEPs for the two years, 1998-99 and 1999-2000, will have a material bearing on any questions as to obligations of the school system for the year 2000-2001, which soon concludes, and possibly

_____

[1]    Put another way, neither the district court nor the hearing officer concluded that the reason Rome should bear the costs for the two years of residential placement was that this placement was the required "free appropriate public education" for DC.  The reimbursement order was based on different grounds and has not been appealed. Even if the reimbursement order had been appealed, the issue identified above would not have necessarily been resolved.

-4-

future years.

Issues arising from past IEPs often circumvent the mootness doctrine because fundamental disputes over the correct interpretation of the IDEA as to a particular student are "capable of repetition as to the parties before it yet evading review." Board of Educ. v. Rowley, 458 U.S. 176, 186 n.9 (1982); see also Daniel R.R. v. State Bd. of Educ., 874 F.2d 1036, 1041 (5th Cir. 1989) ("Given the parties irreconcilable views on the issue, whether to and to what extent to mainstream [the child] will be an issue every time [the school district] prepares a new placement or IEP or proposes to change an existing one.") (citing Honig v. Doe, 484 U.S. 305, 318-20 (1988)); Sacramento City Unified Sch. Dist., Bd. of Educ. v. Rachel H., 14 F.3d 1398, 1403 (9th Cir. 1994). Such controversies are likely to evade review because the "administrative and judicial review of an IEP is 'ponderous' and usually will not be complete until a year after the IEP has expired." Daniel R.R., 874 F.2d at 1041 (citing Burlington, 471 U.S. at 370).[2]

A common feature of these cases involving IDEA disputes capable of repetition yet evading review is the possibility that the

---

[2]     The question of the procedural irregularities found by the hearing officer and discounted by the district court will not recur. Nonetheless, we comment that the hearing officer appears to have improperly read Maine procedural law.

We have considered Mrs. B.'s argument that the district court unlawfully referred her case for a recommended decision by the magistrate judge, but we found it to be utterly without merit.

school district would continue to adhere to a policy that violates the IDEA.  In Daniel R.R., for example, the court resolved differing interpretations of the IDEA's requirement that learning disabled students should be educated in the general curriculum -- the "mainstreaming requirement."  874 F.2d at 1040-41.  In Honig, the Supreme Court ruled that an action concerning whether a school had authority under the Act to unilaterally change a student's placement was not moot because there was "a sufficient likelihood" that the controversy would recur.  484 U.S. at 322-23.

The core of the controversy between Mrs. B. and Rome over the adequacy of the IEP involves the extent of DC's needs for behavior management services, a dispute which includes both questions of fact and interpretations of the IDEA.  The contours of any factual dispute change shape as the years go on.  Indeed, the IDEA recognizes that children's needs change over time, and it thus requires annual evaluation and development of an IEP for each school year.  But the parties' irreconcilable views on the extent to which the IDEA requires a school to provide services to address a learning disabled child's behavior problems is a controversy that is likely to recur as Rome proposes new IEPs.  Thus, we pause briefly to clarify a few points, not as a ruling on the merits of past IEPs nor as a suggestion of a proper placement for future school years, but to indicate the factors to be included in a proper analysis under the IDEA.

States accepting federal funding must assure all learning disabled children the right to a "free appropriate public education," 20 U.S.C. § 1400(d)(1)(A), by providing "access to specialized instruction and related services . . . individually designed to provide educational benefit to the handicapped child," Rowley, 458 U.S. at 201. Under the requirement of access to "related services," a school district's special education program must include psychological services if a learning disabled child's emotional disturbances interfere with his ability to learn. See Roland M. v. Concord Sch. Comm., 910 F.2d 983, 991-92 (1st Cir. 1990); 20 U.S.C. § 1401(3) (defining the term "child with a disability"); 20 U.S.C. § 1401(22) (listing "psychological services, . . . social work services, [and] counseling services" as "related services"). The IDEA recognizes that a "serious emotional disturbance" constitutes a disability if "by reason thereof, [the child] needs special education and related services." Id. § 1401(3)(A).

The hearing officer and the magistrate judge recognized that behavior management services fall within the scope of services a school district may be required to provide under the IDEA. But they differed on the question whether DC's behavior interfered with his ability to obtain educational benefit, and therefore the proper level of services that should be addressed to DC's behavior needs. The magistrate judge concluded that DC's behavior problems manifest themselves most

-7-

frequently outside of school, and thus found adequate the level of behavior management services in Rome's special education program.

There are some facts in the record, important to the hearing officer, not accounted for in the magistrate judge's legal conclusions. The district court must consider the state agency's findings carefully and "endeavor to respond to the hearing officer's resolution of each material issue." Burlington II, 736 F.2d at 792. For example, there is ample evidence that DC's behavior problems did spill over into school, interfering with his ability to obtain educational benefit. Indeed, DC's third-grade teacher in April 1997 was so concerned about DC's behavior management that he requested DC be given a one-to-one aide for those purposes. The hearing officer cited several instances of aggressive behavior by DC while in school, including hitting other students, destroying property (including destroying playground equipment with the consequent risk of injury to others), and, most alarming, twice bringing a nine-inch buck knife to school. That evidence factored heavily in the hearing officer's decisions and was relevant to the determination of whether the services offered in Rome's proposed IEPs were adequate. If the failure of the magistrate judge to address in the legal analysis these aspects of DC's behavior issues reflected a view that this evidence was not relevant,[3] then that view

---

[3] Language in the magistrate judge's opinion suggests the view that unless the child "was uncontrollable both in and out of school," thus "rendering him uneducable," the behavior does not need to be

was in error.

Unless DC has made progress on managing his behavior from the prior years, it is likely that any IEP must define the related services DC requires in order to receive a free appropriate public education.[4] There is a built-in flexibility in the statute's lack of precision, and these types of determinations are better made by those involved in designing a program tailored to meet a child's unique needs: the members of the pupil evaluation team and Mrs. B.

Still, this does not mean the residential placement Mrs. B. has settled on is required or that any residential placement is required. Both the hearing officer and the district court concluded that the placement at this residential school was not required. Even if DC has since made academic progress at his residential school, that fact does not establish that such a placement comprises "the requisite adequate and appropriate education." Roland M., 910 F.2d at 990 (internal quotation marks omitted). All the school system must provide

addressed in the IEP. We know of no such rule. The question is whether these behavioral disturbances interfered with the child's ability to learn. See Roland M., 910 F.2d at 991-92.

[4] Before the state hearing on the 1999-2000 IEP, an alternative placement for DC became available at the Swasey School, a private, state-approved special education school in Maine. The Swasey School provides access to the general curriculum to students who are experiencing difficulties (similar to DC's) in their present educational setting and focuses on treating those behaviors that interfere with the child's ability to learn. The parties have not yet had the opportunity to fully consider that option.

is an IEP which is "reasonably calculated" to provide an "appropriate" education, as defined by the common standard in Maine and federal law. Id. at 992. And within that context, Congress has in the IDEA expressed a preference for mainstreaming. "Mainstreaming may not be ignored, even to fulfill substantive educational criteria." Id. at 992-93.

The child, DC, is now in a different position than in previous proceedings: the IDEA's "stay put" provision, a preference for maintaining a child in his current placement throughout both the administrative and judicial proceedings challenging a placement decision, no longer applies because this judicial proceeding terminates with this opinion. See Doe v. Brookline Sch. Comm., 722 F.2d 910, 915 (1st Cir. 1983).[5] The IDEA requires Rome to generate an annual IEP based on DC's current needs. If the parties cannot reach an agreement,

---

[5]      The hearing officer endorsed Mrs. B.'s unilateral placement of DC only after finding that Rome had failed to provide DC with an adequate educational program. That is a different issue, and one viewed more favorably to the parent, than the question whether this residential placement was required in order to provide a free appropriate education to DC. See Burlington II, 736 F.2d at 799-801; Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 12-13 (1993). We note that our decision in Burlington II rested on our determination that retrospective reimbursement by parents is not "appropriate" relief available under the IDEA where parents have relied on an agency's decision in their favor. Otherwise, "parents will be placed in the difficult position of having to choose between the state directive to maintain the child in the private placement at the risk of ultimately using their own funds, or of moving the child to the town's placement which the state agency has determined to be inadequate," which would contravene the IDEA's stay-put provision. 736 F.2d at 800.

they may then pursue the appropriate remedies as provided by the IDEA.

We make one final point.  Congress mandated a system under the IDEA of considerable involvement by parents together with school systems in formulating IEPs.  Judges are not experts on educational theory.  The education of DC will be best served by Mrs. B. and Rome working together.

We dismiss Mrs. B.'s appeal.  No costs are awarded.