**BONNIE ANN F., by her next friends JOHN R.F. and Karen A.F., Plaintiffs,**

v.

**CALALLEN INDEPENDENT SCHOOL DISTRICT, Defendant.**

Civ. No. C–91–259.

United States District Court, S.D. Texas, Corpus Christi Division.

Sept. 9, 1993.

Clyde Lee Wright, III, Corpus Christi, TX, for plaintiffs.

Elena M. Gallegos, Cheryl Denise Howell Anderson, Walsh, Judge, Anderson, Underwood & Schulze, Austin, TX, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

MILES, Senior Judge, Sitting by Designation.

In this action filed under the Individuals with Disabilities Education Act ("IDEA," for-

merly the Education of the Handicapped Act), 20 U.S.C. § 1400 *et seq.*, the plaintiff, a hearing impaired child, is alleging that the defendant school district failed in its obligation to provide her with a free appropriate public education as required by federal law. On her behalf, her next friends and parents are seeking reimbursement from the defendant for the costs of attendance at a private school for the deaf during a nine-week period in 1991.

At the conclusion of an administrative hearing, a hearing officer determined that the defendant had fulfilled its responsibility to provide the plaintiff with a free appropriate public education as required by the IDEA. The plaintiff then filed this action under 20 U.S.C. §§ 1415(e)(2) and (e)(4)(A). The matter is now ready for decision.

### FINDINGS OF FACT

Based on the administrative record on file with the court, based on the testimony and exhibits received at trial, based on the pretrial order on file with the court, including the admissions of fact contained therein, the court makes the following findings of fact as required by Fed.R.Civ.P. 52(a) [1]:

1. Plaintiff Bonnie Ann F. (hereinafter "Bonnie") was born on May 21, 1987.

2. This action is filed on the plaintiff's behalf by her next friends, her parents John R.F. and Karen A.F.

3. At all times pertinent to this action, Bonnie resided with her parents within the boundaries of the defendant Calallen Independent School District ("CISD").

4. Bonnie was born a hearing child. However, on May 3, 1989, near the age of two, she contracted meningitis and suffered a profound loss of hearing in both ears. On August 10, 1989, testing indicated that she had no detectible hearing.

5. After Bonnie lost her hearing, her parents immediately began a parent/infant program through the CISD.[2] This program used the "total communication" methodology by mutual consensus of the CISD and Bonnie's parents. As part of the program, and at the choice of her parents, both Bonnie and her parents began sign language instruction.

6. Total communication is an instructional methodology employing a multimodal, multichannel method of instruction for speech, listening, language, and academic development of hearing impaired children. The philosophy of the methodology focuses on the use of any and all channels or modes of communication in order to reach effective two-way communication with a child. Total communication allows and encourages the use of signed English, provided it is helpful in a given situation with a given child.

7. In mid-March, 1990, Bonnie received a cochlear implant. The implant was activated on April 28, 1990.

8. A cochlear implant is a relatively new technology available for use by hearing impaired children who have a specified degree of hearing loss. The implant does not restore normal hearing; sounds that are heard through the device do not precisely resemble those heard by persons with normal hearing capabilities.

---

1. Any finding of fact containing conclusions of law shall be considered as such.

In making its findings, the court has considered the evidence admitted at the administrative hearing as well as the supplemental evidence admitted at the trial of this matter. The court has not, however, considered certain evidence supplemental to the administrative record which the plaintiff submitted, including but not limited to certain affidavits and scholarly materials, given the status of this proceeding as essentially a review of an administrative decision. The court has likewise not considered plaintiff's "Post–Hearing Brief and Discussion of Evidence," and the defendant's motion to strike this brief (docket no. 78), which the plaintiff has not opposed, is

hereby **GRANTED.** Plaintiff's brief contains references to documents not offered or admitted into evidence, and rather than to parse out those portions which are based on the evidence and those which are not, the court has determined that the entire document should be stricken in its entirety.

2. The parent-infant program was adopted by the Texas Education Agency to provide services to hearing impaired children ages birth to three years. Among other things, it provides parents with educational information and instruction concerning deafness and its implications for educational purposes, and educates infants in the components of communication.

9. Bonnie remains a hearing impaired child despite her cochlear implant.

10. Implant users, such as Bonnie, must go through a great deal of relearning following receipt of the device. After receiving her implant, Bonnie made significant progress in her speech development.

11. During the 1990–91 school year, Bonnie was placed at the Regional Day School for the Deaf, located at Calk Elementary School, located approximately 25 miles from her home district.[3]

12. At Calk Elementary, Bonnie was placed in teacher Sue Ann Jasper's class, a self-contained classroom in which, at the time, five handicapped students, ages three and four, were being instructed by Ms. Jasper and a paraprofessional. Ms. Jasper holds certificates in speech pathology, speech and hearing therapy, and deaf education. Bonnie's school day began at 8:00 a.m. and ended at 3:00 p.m.

13. The instructional methodology used in Ms. Jasper's class was total communication. At the beginning of the 1990–91 school year, Bonnie communicated using total communication.

14. The major elements of Bonnie's educational program were language development, speech development, auditory training, preschool readiness activities, and motor development.

15. Ms. Jasper provided Bonnie with individual auditory training and speech therapy for a short period of time during the school day. She then reinforced and integrated these lessons throughout the day. Language development training was incorporated in daily class activities.

16. Judy Brashear, a speech therapist employed by the Corpus Christi Independent School District in which Calk Elementary School was located, supplemented Ms. Jasper's speech, language, and auditory training by providing individual therapy 45 minutes per week.

17. At some point during the 1990–1991 school year, Bonnie's father, John R.F., became concerned because he believed that Bonnie had a preference for sign language over speech. Mr. F. decided that he did not want Bonnie to use sign language, because he feared that it would lead to her becoming part of what he described as the "deaf subculture" or "deaf community."

18. On December 28, 1991, Bonnie's parents obtained an evaluation of their daughter from the Houston Ear Research Foundation. Bonnie was three years, seven months old at the time of this evaluation. As a result of this evaluation, Bonnie's language age was assessed at three years, three months on a receptive vocabulary test, and three years on an expressive English syntax test.

19. On February 8, 1991, Bonnie's parents obtained another evaluation of their daughter, this time an informal assessment, from Linda Daniel, the director of the TALK Center, located in Dallas, Texas. The TALK Center provides therapy and training to hearing impaired children directed to the development of spoken English without the use of sign language. Ms. Daniel herself does not sign. She met with Bonnie for approximately one hour and performed no formal testing. As a result of her meeting with Bonnie, Ms. Daniel recommended that Bonnie be placed in an aural/oral classroom program, combined with individual therapy or tutoring.

20. Like total communication, an aural/oral methodology uses auditory training, speech development, and language development in communicating with hearing impaired children. However, unlike total communication, the aural/oral approach excludes the use of signed English. The latter philosophy instead focuses on developing the child's use of their residual hearing for com-

---

**3.** Calk Elementary School is a regular elementary school located in the Corpus Christi Independent School District. The Corpus Christi Independent School District is the fiscal agent of the Regional Day School Cooperative which serves auditorially handicapped children. Defendant Calallen Independent School District is a member of the Regional Day School Cooperative. The Regional Day School for the Deaf is not a separate school itself; rather, classes are conducted on various campuses located in the Cooperative.

munication and speech development without signing.

21. Mr. F. left the visit to the TALK Center determined to follow Ms. Daniel's recommendations regarding his daughter in full. He was, at that point, determined that his Bonnie would be removed from any exposure to an environment in which sign language was used.[4]

22. Mr. and Mrs. F. requested an Admission, Review and Dismissal ("ARD") Committee meeting with the CISD, which was held on February 12, 1991. At this ARD Committee meeting, Mr. F. requested that Bonnie be placed in an aural/oral program, without the use of sign language. He also requested, in addition to a change in Bonnie's placement, that the CISD provide Bonnie with one hour per day each of individual speech therapy and auditory training. The ARD Committee, while generally agreeing that Bonnie should be placed in an aural/oral environment, suggested alternatives, including placing Bonnie in a private nursery school at the district's expense and placing her in a pre-kindergarten program located in the district. However, Mr. F. expressed an inability to make a decision and requested a recess of the meeting.

23. The ARD Committee reconvened on February 28, 1991. At that meeting, Mr. F. stated that he did not have any disagreement with Bonnie's Individual Educational Plan ("IEP") itself. However, he persisted in his request that Bonnie be provided with a separate aural/oral program.

At the meeting, Bonnie's teachers expressed concerns regarding Bonnie's transition from a total communication to an aural/oral program, and suggested the remaining three months of the school year as an appropriate transition period. The ARD Committee agreed that Ms. Jasper and Ms. Brashear would not use the signed English component of total communication when working with Bonnie on an individual basis; in other words, they agreed that all one-on-one communication with Bonnie would be in spoken English only. The ARD Committee, however, desired that Bonnie remain in the total communication environment of Ms. Jasper's classroom for the period from March, 1991 to May, 1991, as a transition period from her current environment to an aural/oral placement, which they agreed to provide beginning in August, 1991.[5]

24. Despite the assurances given by the ARD Committee that CISD would provide an aural/oral program for Bonnie during the 1991–1992 school year, Mr. F. remained concerned—unreasonably so, in the court's view—that the district would not provide such a program. At the February 28, 1991 ARD Committee meeting, Mr. F. presented the Committee with a typed letter to the Commissioner of Education requesting a due process hearing.

25. After the February 28, 1991 ARD Committee meeting, Ms. Jasper and Ms. Brashear discontinued the use of signed English when working with Bonnie on an individual basis.

26. The 1991 IEPs for Bonnie show that she made progress on her auditory learning goals, language arts goals, readiness goals, social/emotional goals, social science goals, and math goals. All in all, during her enrollment in Ms. Jasper's class, Bonnie made significant progress toward becoming an "oral" child.

27. On April 1, 1991, Mr. and Mrs. F. unilaterally enrolled Bonnie in the Sunshine Cottage for the Deaf and removed her from

---

4. Bonnie's mother, Karen A.F., was not quite as firm in her resolve to insulate Bonnie from signing. She continued to use sign with Bonnie in their home on certain occasions, including times when Bonnie's implant was not in operation, when communicating with Bonnie at a distance, and when trying to emphasize certain words with her daughter.

5. The CISD's plan for the 1991–1992 school year was to place Bonnie in a newly-developed aural/oral program at Magee Elementary School, which is Bonnie's "home" school, being nearest to her parents' residence. (Magee is located approximately 300 yards from Mr. and Mrs. F.'s residence.) Bonnie was eventually enrolled in that program as planned, and the parties are in

Ms. Jasper's class at Calk Elementary.[6] Sunshine Cottage is located in San Antonio, Texas approximately 300 miles from Mr. and Mrs. F.'s residence. During April and May, 1991, for approximately nine weeks, Bonnie was transported daily by her uncle to San Antonio in order to attend class for three hours and fifteen minutes at Sunshine Cottage.

28. Sunshine Cottage offered an aural/oral program for hearing impaired children without the use of sign language. The specifics of Bonnie's program at Sunshine Cottage have not been established; no one from the school has testified in these proceedings, and Mr. F. did not observe Bonnie at the school. While Mrs. F. observed her daughter at the school on a brief videotape and for a second, more extended period in person, she did not relate the entire content of Bonnie's educational program at the school.

29. During April and May, 1991, Mr. and Mrs. F. also obtained private speech therapy and auditory training for Bonnie from Ms. Patsy Osterloh. These sessions, which Bonnie attended for a total of three hours per week, were intended by her parents to supplement the Sunshine Cottage program.

30. At the due process hearing held May 14 to May 16, 1991, the parties stipulated that the sole issue for the hearing was whether Bonnie's parents were entitled to reimbursement for their unilateral placement of Bonnie at Sunshine Cottage beginning on April 1, 1991, due to an alleged inappropriateness of the education being provided to Bonnie by CISD at that time.

31. After the conclusion of the due process hearing, the hearing officer determined that the reimbursement relief sought by Mr. and Mrs. F. on behalf of Bonnie for her unilateral placement at Sunshine Cottage was not supported, because Bonnie was receiving a free, appropriate public education from CISD until she was withdrawn by her parents.

32. During the 1992–1993 school year, Bonnie was fully mainstreamed in a regular kindergarten class. Her ability to be mainstreamed at such an early age has exceeded even Mr. F.'s expectations. While Mr. F. attributes Bonnie's success at least in part to her experience at Sunshine Cottage, Mrs. F. has expressed disappointment in the Sunshine Cottage program because she believed that much of what Bonnie had learned at the school had been a repeat of what she had already learned in Ms. Jasper's class.

33. When Bonnie was removed by Mr. and Mrs. F. from Ms. Jasper's class at the end of March, 1991, she was receiving a free, appropriate public education in an appropriate placement.

## CONCLUSIONS OF LAW

In accordance with Fed.R.Civ.P. 52(a), the court reaches the following conclusions of law [7]:

A. The court has jurisdiction over this matter under the IDEA, pursuant to 20 U.S.C. § 1415(e)(2) and (e)(4)(A).

B. Venue is proper in this district.

C. Pursuant to 20 U.S.C. § 1412(1), Bonnie is and was, at all times pertinent to this action, entitled to a free appropriate public education from the CISD.

D. The IDEA defines a "free appropriate public education" as special education and related services that—

(A) have been provided at public expense, under public supervision and direction, and without charge,

(B) meet the standards of the State educational agency,

(C) include an appropriate preschool, elementary, or secondary school education in the State involved, and

---

agreement that this was an appropriate program for her.

**6.** Mr. and Mrs. F. did not discuss Bonnie's move to Sunshine Cottage with the ARD Committee.

**7.** Any conclusion of law containing findings of fact shall be considered as such.

**(D)** are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.

20 U.S.C. § 1401(a)(18).[8]

■ E. The individualized education program, or "IEP," is the *"modus operandi"* of the IDEA. *School Committee of the Town of Burlington, Massachusetts v. Department of Educ. of the Commonwealth of Massachusetts,* 471 U.S. 359, 368–369, 105 S.Ct. 1996, 2002, 85 L.Ed.2d 385 (1985). The IEP is, in brief,

a comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services to be employed to meet those needs. § 1401(19). The IEP is to be developed jointly by a school official qualified in special education, the child's teacher, the parents or guardian, and, where appropriate, the child. In several places, the Act emphasizes the participation of the parents in developing the child's educational program and assessing its effectiveness.

*Id.* However, because Congress has recognized that this cooperative approach envisioned by the Act "would not always produce a consensus between the school officials and the parents," the *district courts' grant of authority under 20 U.S.C. § 1415(e)(2)* includes the power to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the IDEA. *Id.,* 471 U.S. at 368–369, 105 S.Ct. at 2002.

F. Pursuant to 20 U.S.C. § 1414(a)(5), prior to its 1991 amendment, local educational agencies such as CISD were required to establish or revise, whichever is appropriate, an individualized education program for each handicapped child at the beginning of each school year and ... then review and, if appropriate, revise, its provisions periodically, but not less than annually.

■■ G. The requirement of a free appropriate public education is satisfied if the State provides personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. *Board of Educ. of the Hendrick Hudson Central School Dist. v. Rowley,* 458 U.S. 176, 202–204, 102 S.Ct. 3034, 3049, 73 L.Ed.2d 690 (1982); *Christopher M. v. Corpus Christi Indep. School Dist.,* 933 F.2d 1285, 1289 (5th Cir.1991). While the educational benefit provided to the child must be "meaningful," the IDEA does not require the State to attempt to maximize each child's potential. *Christopher M.,* 933 F.2d at 1289.

■ H. This court's inquiry in an action such as this brought under § 1415(e)(2) is twofold:

First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Rowley,* 458 U.S. at 206–207, 102 S.Ct. at 3051. In its inquiry, the court must make an independent determination based on a preponderance of the evidence, giving due weight to the state administrative proceeding. *Id.* at 204–206, 102 S.Ct. at 3050.

■ I. The complaint in this action is devoid of any suggestion that the CISD did

---

**8.** "Special education" is defined by the IDEA as specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a child with a disability, including—
 **(A)** instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and
 **(B)** instruction in physical education.
 20 U.S.C. § 1401(a)(16).
 Prior to the 1991 amendment of the IDEA, the term "related services" was defined as transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology ...) as may be required to assist a handicapped child to benefit from special education, and includes the early identification and assessment of handicapping conditions in children.
 20 U.S.C. § 1401(a)(17).

not comply with the procedures set forth in the IDEA. Therefore, the only issue to be decided by this court is whether the IEP developed for Bonnie was reasonably calculated to enable Bonnie to receive educational benefits. In this regard, the CISD's program is entitled to a presumption of appropriateness. *See Tatro v. State of Texas,* 703 F.2d 823, 830 (5th Cir.1983) ("the central role of the IEP in the educational scheme contemplated by the [Act] and the standard of review developed in *Rowley* gives rise to a presumption in favor of the educational placement established by [the IEP]"), *aff'd in part and rev'd in part,* 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984); *see also Alamo Heights Indep. School Dist. v. State Board of Educ.,* 790 F.2d 1153, 1158 (5th Cir.1986); *Christopher M.,* 933 F.2d at 1290–91. The burden therefore rests with the plaintiff, as the party attacking the placement, to show why the educational setting established by the IEP is not appropriate. *Tatro,* 703 F.2d at 830; *Alamo Heights,* 790 F.2d at 1158; *Christopher M.,* 933 F.2d at 1291.

■ J. The overwhelming weight of the evidence establishes that under the standard set forth in *Rowley,* Bonnie was receiving a free appropriate public education at the time Mr. and Mrs. F. removed her from enrollment in CISD's Regional Day School for the Deaf. The evidence shows that Bonnie had made, and was continuing to make, significant progress in her speech and auditory skills as a result of her experience in and individualized instruction provided by Ms. Jasper's class, together with the individual speech therapy provided by Ms. Brashear. Therefore, the IEP developed for Bonnie through the IDEA's procedures was reasonably calculated to enable her to receive educational benefits.

K. The plaintiff has framed this action as essentially a dispute over educational methodologies. Specifically, the complaint alleges that CISD failed to provide a free appropriate public education for Bonnie "because of the language or communication method used in the teaching methodology." Complaint, ¶ 4.01. However, the question presented in this action filed under § 1415(e)(2) and (e)(4)(A) is not whether an aural/oral methodology is generally superior to the total communication methodology in the education of hearing impaired children. "Philosophical debates concerning the best method of educating the hearing-impaired are best left to educators who consider this problem their metier." *Visco v. School Dist. of Pittsburgh,* 684 F.Supp. 1310, 1313 (W.D.Pa.1988). As the Court stated in *Rowley,*

> In assuring that the requirements of the Act have been met, courts must be careful to avoid imposing their view of preferable educational methods upon the States. The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child.

458 U.S. at 207, 102 S.Ct. at 3051. "A major part of the task of local and state officials in fashioning what they believe to be an effective program for the education of a handicapped child is the selection of the methodology or methodologies that will be employed." *Lachman v. Illinois State Board of Educ.,* 852 F.2d 290, 296 (7th Cir.), *cert. denied,* 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 327 (1988). "[P]arents, no matter how well-motivated, do not have a right under the [Act] to compel a school district to provide a specific program or employ a specific methodology in providing for the education of their handicapped child." *Id.* at 297. Similarly, this action does not require the court to determine whether the methodology employed in instructing Bonnie allowed her to maximize her potential. *See Christopher M.,* 933 F.2d at 1291 (district is not obligated to supply child "with the maximum benefit possible, but only to provide a meaningful education"). "*Rowley* makes clear that 'once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the State.'" *Lachman,* 852 F.2d at 294 (citation omitted).

L. Mr. and Mrs. F. have made a number of additional arguments in support of their contention that the CISD has violated the IDEA or applicable federal regulations

thereunder. The court has reviewed these arguments in some detail. Some of these contentions result from either a misunderstanding of or mischaracterization of what the statute and/or regulations require, while others have simply been waived or are not supported by the record.

Mr. and Mrs. F. argue that upon determining in February, 1991 that Bonnie would best be educated using an aural/oral methodology, the CISD had an obligation to provide that methodology on an "immediate" basis. Title 34 C.F.R. § 300.342, which they cite in support of their argument, provides that an IEP must be implemented "as soon as possible following the meetings under § 300.343." [9] While the Comment to § 300.342 states that "it is expected that a handicapped child's individualized education program (IEP) will be implemented immediately following the meetings under § 300.343," the Comment also acknowledges that in certain circumstances, a delay will be tolerated, such as when the meetings occur during the summer or a vacation period, or where transportation arrangements must be made. Whatever delays may be tolerated under § 300.342, however, is beside the point. Mr. F., who with Mrs. F. has pursued these proceedings on Bonnie's behalf, stated at the relevant time that he had no problems with Bonnie's IEP itself; rather, it was the methodology used for teaching Bonnie which he wanted altered.[10] To the extent that Bonnie's IEP was revised in February, 1991—a circumstance which has not been established, in this court's view—the revision was implemented without undue delay when Ms. Jasper and Ms. Brashear ceased their use of signed English with Bonnie on an individual basis after the February, 1991 ARD Committee meetings.

Mr. and Mrs. F. also argue that the State of Texas has adopted for itself a standard for the education of hearing impaired children which exceeds the burden placed on the State by the IDEA. *See Geis v. Board of Educ. of Parsippany–Troy Hills, Morris County,* 774 F.2d 575, 583 (3d Cir.1985) (State of New Jersey imposed a higher standard of special education than that required by the Act, where State Administrative Code required that handicapped pupils be provided a program "according to how the pupil can best achieve success in learning"). In support of this argument, they rely on Texas Educ.Code § 11.10(*o*)(6), which provides in pertinent part as follows:

(*o*) To carry out legislative intent . . . and the following subsections of this Section 11.10, the Central Education Agency shall employ a director and assistant director of services to the deaf. The director of services to the deaf shall develop and administer a comprehensive statewide plan for deaf education services including continuing diagnosis and evaluation, counseling and teaching, and designed to accomplish the following objectives:

\* \* \* \* \* \*

(6) Recognizing the need for development of oral communications abilities in deaf children and the ability of many to achieve high educational excellence through that method, but also recognizing the inability of some to gain their education successfully by this means, the comprehensive plan developed by the director of services to the deaf will call for the use of methods of communication which will best meet the needs of each individual deaf child in this state, with

---

**9.** Title 34 C.F.R. § 300.343 requires public agencies such as the CISD to initiate and conduct meetings at least annually for the purpose of developing, reviewing, and revising a child's IEP, although it is clear that such meetings may be held more frequently than annually.

**10.** 34 C.F.R. § 300.346 provides that an IEP must include:
 (a) A statement of the child's present levels of educational performance;
 (b) A statement of the annual goals, including short term instructional objectives;

(c) A statement of the specific education and related services to be provided to the child, and the extent to which the child will be able to participate in regular educational programs;
 (d) The projected dates for initiation of services and the anticipated duration of the services; and
 (e) Appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether the short term instructional objectives are being achieved.

each child to be examined thoroughly so as to ascertain his potential for communications through oral means. The director of services to the deaf may establish separate programs to accommodate diverse communication methodologies.

Mr. and Mrs. F. contend that this statute required CISD to provide a program employing an aural/oral methodology for Bonnie because this methodology would, in February, 1991, "best meet the needs" of her as an individual.

Mr. and Mrs. F. ignore the fact that the plan enacted by the State of Texas in compliance with the statutory directive contained in § 11.10(o)(6) the "Regional Program Evaluation Guide"—does not require local school districts such as the CISD to have separate programs to accommodate different communication methodologies. Moreover, to the extent that this statute does impose a higher burden on Texas school districts than that imposed by the IDEA, it clearly allows for use of the "methods of communication" which will best meet the "needs" of each individual child. This language recognizes that there may be more than one best method, and that children may have more than one need. In this case, the CISD agreed that for the remainder of the 1991 school year, two differ-

ent methods would be used with Bonnie—total communication and the aural/oral approach. Bonnie had certainly progressed in her skills under the former method, and the CISD agreed that she could likewise benefit from the latter method.[11]

The ARD Committee did agree with Mr. and Mrs. F. and an aural/oral program would "best" meet Bonnie's needs, and they agreed to provide one—beginning in August, 1991. In the interim, they agreed that Bonnie would receive aural/oral individual instruction from Ms. Jasper and Ms. Brashear in a total communication environment. As the hearing officer correctly noted, this decision was made taking into account Bonnie's "needs," as § 11.10(o)(6) requires. Bonnie is a human child with emotional as well as educational needs. The CISD considered the possible effect that abruptly removing her from Ms. Jasper's class would have, and determined that a "weaning" period, during which an aural/oral methodology would be used in a total communication environment, was what she needed. The court, having reviewed the testimony in the administrative record and heard additional live testimony, is convinced that those responsible for making this decision were sincere in having Bonnie's best interests at heart[12], that they acted

11. Specifically, with respect to preschool programs for three and four year old hearing impaired students, the RPEG provides as follows:
 1. The program operates the preschool program a minimum of three hours per school day.
 2. The program provides annual goals and short-term instructional objectives for the consistent development of receptive language, expressive, auditory training, speech for the deaf, speechreading and other components of communication.
 3. The classroom teacher is the primary instructor for speech, language and auditory training.
 4. A speech and language pathologist/therapist is available to supplement the classroom teacher's speech, language, and auditory training programs.
 5. The program provides annual goals and short-term instructional objectives for the consistent development of the social skills of the students.
 6. All students enrolled in the preschool have completed SKI*HI, INSITE or a similar program. If not, they are being served by a parent advisor until they complete the program.

 7. The average four year old is within one year of his hearing peers in expressive skills.
 8. The average four year old is within one year of his hearing peers in receptive skills.
 9. All students for whom amplification has been recommended wear appropriate amplification devices including hearing aids and/or Auditory Training Units.

 The plaintiff has not established that any of these elements of the RPEG were not being satisfied.

12. Nora Hancock, the Director of Special Programs for the CISD, perhaps stated the district's reasoning most persuasively:

 ... And I think that one of the things that I know I kept thinking in my mind is, she was two. She had a trauma in her life. We provided her with signing. She became successful. She's thrived, she's becoming oral, and now here it is February. We're going to yank her where she's supported with people who love her and nurture her and just say, 'Now we've decided tie the hands. Do this. Here it is.' I just—Bonnie is more than just speech language and auditory skills. She's a total child. And I don't think you can separate that.

appropriately in effecting Bonnie's gradual transition away from an accustomed mode of communication, and that they did not delay her progress.

Mr. and Mrs. F. also argue that the CISD failed in its duty to provide a continuum of alternative placements, as required by 34 C.F.R. § 300.551. This contention is totally unsupported by the record. At the ARD Committee meeting held on February 12, 1991, different possibilities for Bonnie's placement—including private nursery school (at district expense) and a pre-kindergarten placement at Magee Elementary—were suggested to Mr. F. However, it is apparent from the record that he was not interested in pursuing these alternative placements on behalf of his daughter.

■ Mr. and Mrs. F. additionally argue that the CISD failed in its duty to provide Bonnie with a placement at the school nearest to their residence, i.e., the school which Bonnie would normally have attended, in violation of 34 C.F.R. § 300.552. However, this is not what 34 C.F.R. § 300.552 requires in every instance. Rather, it requires that placement be determined at least annually, and that it be located "as close as possible to the child's home." Moreover, § 300.552 provides that "[u]nless a handicapped child's [IEP] requires some other arrangement, the child is educated in the school which he or she would attend if not handicapped." The record does not indicate that Mr. and Mrs. F. expressed dissatisfaction with the location of Bonnie's placement—in Ms. Jasper's classroom at the somewhat distant Calk Elementary—at the beginning of the 1990–1991 school year when Bonnie was placed there. The record clearly indicates that the parents' expressed difficulty with the program at Calk after February, 1991 was not its location, but its methodology. In addition, the record clearly indicates that the ARD Committee proposed sending Bonnie to a pre-kindergar-

ten program at her home school—Magee Elementary—but that Mr. F. expressed no interest in this placement. Accordingly, the court concludes that the issue of non-compliance with § 300.552 has been waived.

■ Mr. and Mrs. F. have also argued that the court should conclude that the CISD failed to meet the mainstreaming requirements of 20 U.S.C. § 1412(5)(B).[13] This argument, however, contradicts the plaintiff's admission that at the administrative hearing the parties agreed that mainstreaming during 1991 was not an issue. Amended Joint Pretrial Order at 11, ¶ KK. Clearly, mainstreaming was not an issue for Bonnie in 1991 as far as her parents were concerned; they refused to pursue mainstream placements suggested by the ARD Committee (which included placement in a private nursery school at district expense), and instead placed their daughter in a school for the deaf located in San Antonio. Their goal, which has now been achieved, was that Bonnie would be *eventually* mainstreamed in a regular kindergarten. Because they did not seek mainstreaming for Bonnie in 1991 and did not raise this issue at the administrative hearing, Mr. and Mrs. F. have waived this issue on behalf of their daughter.

N. Finally, Mr. and Mrs. F. have proposed that the court conclude that Bonnie's Fourteenth Amendment rights were abridged insofar as the State of Texas has discriminated against her by failing to provide her with the same educational opportunities available to other hearing impaired students who reside in other parts of Texas. However, assuming that such discrimination had been established by competent evidence of what opportunities are provided to children in other locales, the State of Texas is not a defendant in this proceeding. Rather, the defendant is a local educational agency, and the record does not suggest that this

---

Transcript of Administrative Hearing, May 15, 1991 at 170.

13. This section requires states to establish
> ... procedures to assure that, to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and

> that special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in the regular classes with the use of supplementary aids and services cannot be achieved satisfactorily[.]

defendant has control over whether different programs for hearing impaired students may be provided in other regions in the State. Accordingly, the court finds this argument to be without merit.

### CONCLUSION

The program provided for Bonnie by the CISD was appropriate and reasonably calculated to enable her to ultimately enter kindergarten with other children her age. That Bonnie's parents, in particular Mr. F., may have developed an aversion to the total communication environment provided by the program does not, however, entitle them to reimbursement for Bonnie's private schooling in accordance with *Burlington*. As parents, Mr. and Mrs. F. should be lauded for making the sacrifices involved in expending their own funds in order to send their daughter to a school which they believed to be the best available for her—one which they believed would assure her abrupt abandonment of signing and prevent her future association with the "deaf subculture." However, the Act contemplates that parents—even those who harbor the best of intentions—who unilaterally change their child's placement during the pendency of review proceedings without the consent of school officials do so at their own financial risk. 471 U.S. at 372–374, 105 S.Ct. at 2004.

Accordingly, the court concludes that the decision of the hearing officer shall stand, that a judgment of no cause of action shall be entered, and that the defendant shall recover of the plaintiff its costs of action.

So ordered.

### ORDER ON DEFENDANT'S SECOND MOTION FOR SANCTIONS

 This matter is before the court on the defendant's Second Motion for Sanctions (docket no. 69). The plaintiff has filed no written response to the motion.[1] Upon due consideration, and in accordance with Rule 6(E) of the Local Rules for the United States District Court for the Southern District of Texas, the court hereby GRANTS defen-

dant's request for leave to file this motion and GRANTS the motion for sanctions.

In its motion for sanctions, defendant the Calallen Independent School District ("CISD") seeks imposition of sanctions against the plaintiff for the following conduct:

1. filing documents with the court and failing to provide copies to CISD in contradiction of the certificate of service;

2. altering jointly submitted documents (namely, the joint pretrial order) without notice to or approval by CISD;

3. violating the court's order of February 20, 1992 and the court's rulings of February 13, 1992 and September 18, 1992 regarding the submission of additional evidence beyond the evidence contained in the administrative record.

CISD seeks sanctions totalling $5,667.33 for costs and attorney's fees incurred as a result of attempts to respond to plaintiff's conduct. This amount has been supported by affidavit of counsel. Although this is CISD's second motion for sanctions, plaintiff has failed to respond to any of the claims made concerning the conduct of this litigation and the increased expenses caused thereby. Under the circumstances, given that Local Rule 6(E) specifically provides that the failure to respond to a motion will be taken as a representation of no opposition, and given that the plaintiff has had ample time to respond, the court finds that the plaintiff has committed the sanctionable conduct alleged and that the CISD is entitled to an award of sanctions against plaintiff. The court further finds that the amount of fees and costs sought is reasonable, with one exception. Specifically, the court finds that the seventeen hours of attorney time spent on preparation of the motion is excessive, and reduces the amount to seven hours, or $770.00. Therefore, the court awards sanctions in the total amount of $4,567.33 as reasonable costs and attorney's fees incurred as a result of plaintiff's conduct. The court's authority for

---

1. Plaintiff likewise filed no response to defendant's previous motion for sanctions, filed November 10, 1992.

imposition of these sanctions is contained in Fed.R.Civ.P. 11 and Fed.R.Civ.P. 16(f).

IT IS THEREFORE ORDERED that defendant's Second Motion for Sanctions is GRANTED, and that plaintiff, or plaintiff's counsel, C.L. Wright, III, shall pay to defendant CISD the sum of $4,567.33 in attorney's fees and costs incurred as a result of the sanctionable conduct.

So ordered.