**Noah LOGUE, by and through his parents and legal guardians Kenneth and Gretchen LOGUE, Plaintiffs,**

**v.**

**SHAWNEE MISSION PUBLIC SCHOOL UNIFIED SCHOOL DISTRICT NO. 512, Defendant.**

**No. 96–2218–KHV.**

United States District Court, D. Kansas.

Feb. 24, 1997.

Stephen Walker, Beachwood, OH, James L. Germer, KAPS, Topeka, KS, Peter R. Williams, Russell, KS, for plaintiffs.

David J. Adkins, Patricia A. Bennett, Bennett, Lytle, Wetzler, Martin & Pishny, L.C., Prairie Village, KS, for defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

States which elect to receive federal funds under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401 *et seq.*, must provide all disabled children a "free appropriate public education." 20 U.S.C. § 1412(1). Under IDEA, the educational program for each disabled child must be defined by an annual Individualized Educational Plan ("IEP") which the school district develops in consultation with the child's parents. 20 U.S.C. § 1401(a)(19); 34 C.F.R. §§ 300.340.–345. The IEP must include the goals, teaching methods, and evaluation procedures appropriate to that child's educational needs, 34 C.F.R. § 300.346, and must be reviewed at least annually. *Id.* at § 300.343(d). The child must be reevaluated at least every three years in conjunction with formulating the IEP. K.A.R. § 91–12–42(b)(4). If the parents dispute the child's special education placement or program, as defined by the IEP, they may seek review by an impartial Hearing Officer through the administration of the state education agency. 20 U.S.C. §§ 1415(a),(b),(d); 34 C.F.R. §§ 300.500–.508. Any party aggrieved by the administrative findings and decision may seek review in a state court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy.

Kenneth and Gretchen Logue are parents of Noah Logue, a hearing impaired child who is now eight years old. They allege that in 1994, the Shawnee Mission School District, U.S.D. No. 512, failed to promulgate an IEP which would afford Noah the "free appropriate public education" to which he was entitled. More specifically, plaintiffs contend that defendant's September 1994 IEP lacked the content required by 91 K.A.R. § 91–12–41(f) and 34 C.F.R. § 300.346, and did not afford Noah "educational benefits in accordance with [his] abilities and capacities," as allegedly required by K.S.A. § 72–962. *Pretrial Order* (Doc. # 38) filed December 18, 1996, at 3.

Plaintiffs also complain about the administrative hearing process, arguing that the hearing officer (a) terminated the proceeding without hearing all of plaintiffs' case; (b) favored defendant in ruling on objections and evidentiary issues; (c) asked leading questions of witnesses and thus became an advocate for the school district; (d) revealed bias by making disparaging facial gestures in response to witness testimony; (e) expressed bias by permitting defendant to ask questions encompassing the law, without allowing plaintiffs to do so; (f) harassed plaintiffs by insisting, after the hearing had been under way for several days, that they retain local counsel; (g) "displaced [sic] bias and advocacy for the school district" by permitting its witnesses to raise substantive issues, then denying plaintiffs the opportunity to examine the witnesses on those issues; (h) prevented plaintiffs from calling important witnesses; (i) disregarded authoritative pronouncements of the Office of Special Education Programs ("OSEP") of the United States Department of Education; (1) improperly assigned plaintiffs the burden of proof; and (k) rendered a decision which contradicted the manifest weight of the evidence. *Pretrial Order* at 4, incorporating by reference *Petitioner's Appellate Brief* in the Due Process Hearing in the State of Kansas Department of Education (December 16, 1995).

The *Pretrial Order* does not reveal what relief plaintiffs seek, but the Court presumes that they seek a judicial declaration that the Shawnee Mission School District violated

**1342**

Noah's rights by preparing an IEP that (a) lacked the content required by 91 K.A.R. § 91-12-41(f) and 34 C.F.R. § 300.346; and (b) did not afford him "educational benefits in accordance with [his] abilities and capacities," as allegedly required by K.S.A. § 72-962. After an extensive hearing, Kathleen Neff, the Kansas Special Education Due Process Hearing Officer, resolved these issues adversely to plaintiffs. She found that the IEPs dated August 16 and September 28, 1994 "clearly fulfill[ed] all requirements of 34 CFR 300.346(a) and K.A.R. 91-12-41(f)," *Hearing Officer's Opinion* at 8, and would give Noah an educational benefit that was not trivial or de minimis, but "likely to produce progress." *Id.* She further concluded as follows:

No rational person would assume that the '94 I.E.P.s, with their intense emphasis on speech and language, and the increased mainstreaming in science, social studies, music, phys. ed., kindergarten centers, recess, lunch, and assemblies, given the child's previous performance, could possibly result in anything but solid progress in the very direction the parents so wished their child to proceed, i.e., intelligible speech.

*Hearing Officer's Opinion* at 8–9. She also observed that the school district had "carefully preserved to the fullest" the Logues' right to participate in the IEP meetings, had presented the Logues with "every alternative possible," and had even provided outside experts for the Logues' further information, *Hearing Officer's Opinion* at 7, and that plaintiffs' own experts (Dr. Denise Wray and Jean Moog) testified that the IEPs would provide educational benefit for Noah. *Hearing Officer's Opinion* at 8. The Hearing Officer observed that the Shawnee Mission District had "absolutely" offered Noah the "free and appropriate education" required by law, Hearing Officer's Opinion at 11, and concluded as follows:

... Shawnee Mission School District # 512 was affording Noah Logue a free and appropriate public education in the least restrictive environment suitable to his present needs. The District had afforded Noah all appropriate related services. The District has met all procedural requirements, and afforded the parents all their

statutory rights. The parents· chose to remove their son from an appropriate placement and enroll him in a school that uses the educational methodology they favor.

*Hearing Officer's Opinion* at 12. Plaintiffs appealed the decision of the Heating Officer, but the State Level Review Officer upheld it on appeal.

■ We review the IDEA administrative proceeding under a standard which the Tenth Circuit Court of Appeals has described as "modified de novo review." *Murray v. Montrose County Sch. Dist. RE-1J*, 51 F.3d 921, 927 (10th Cir.1995), *cert. denied* — U.S. ——, 116 S.Ct. 278, 133 L.Ed.2d 198 (quoting *Doe v. Bd. of Edc.*, 9 F.3d· 455, 458 (6th Cir.1993), *cert. denied* 511 U.S. 1108, 114 S.Ct. 2104, 128 L.Ed.2d 665 (1994)). Such review does not invite the courts to substitute their own notions of sound educational policy for those of school authorities. *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 624 (6th Cir.1990). Courts "should be loath to intrude very far into interstitial details or to become embroiled in captious disputes as to the precise efficacy of different instructional programs." *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 992 (1st Cir.1990), *cert. denied* 499 U.S. 912, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991). Moreover, "due weight" must be given the administrative proceedings. *Murray*, 51 F.3d at 927 (quoting *Board of Educ. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982)). Review must be thorough, yet deferential, should respond to the Hearing Officer's resolution of material issues, and "[w]here the evidence permits two plausible views of adequacy/appropriateness, the agency's choice between them cannot lightly be disturbed." *Roland M.*, 910 F.2d at 989, 994.

■ In exercising its reviewing authority under the law, the Court is also mindful that the burden of proof rests with the party attacking the IEP. *Hall v. Shawnee Mission Sch. Dist.*, 856 F.Supp. 1521, 1524 (D.Kan. 1994) (citing *Johnson v. Independent Sch. Dist. No. 4*, 921 F.2d 1022, 1026 (10th Cir. 1990)). As the Fifth Circuit Court of Appeals stated:

the Act creates a "presumption in favor of the education placement established by [a child's] IEP" and "the party attacking its terms should bear the burden of showing why the educational setting established by the IEP is not appropriate."

*Alamo Heights Indep. Sch. Dist. v. State Bd. of Educ.*, 790 F.2d 1153, 1158 (5th Cir.1986) (citation omitted).

This matter comes before the Court on defendant's *Motion For Summary Judgment Or, In The Alternative For Judgment On The Record* (Doc. # 34) filed December 16, 1996. On February 19, 1997, the Court entered an order in limine which held that at trial, the Court would not receive evidence or testimony about any IEP except the September 1994 IEP, or entertain further testimony (beyond that contained in the administrative record) from Carol Flexer, Kenneth Logue, Daniel Ling, Paulette Strong, Mary Shortal, Georgia Updike or Gretchen Logue. Plaintiffs had listed no additional witnesses, and the Court's ruling had the practical consequence of limiting the scope of review to the administrative record before it. Moreover, because the Court found that it could not reasonably determine the undisputed facts in the face of plaintiffs' flagrant violations of D. Kan. Rule 56.1 and the *Supplemental Scheduling Order* (Doc. # 24) entered September 30, 1996, the Court on February 19, 1997, also ordered stricken from *Plaintiffs' Memorandum In Opposition To Defendant's Memorandum In Support Of Summary Judgment Motion Or, In The Alternative, For Judgement [sic] On The Record* (Doc. # 46) filed January 21, 1997, plaintiffs' response to defendant's statement of uncontroverted facts (as set forth on pages 2 through 12 of plaintiffs' brief) and "Plaintiffs' Additional Statement of Facts" (as set forth on pages 12 through 19 of plaintiffs' brief). For purposes of defendant's motion for summary judgment, the Court stated that it would disregard all facts not set forth in compliance with D. Kan. Rule 56.1 and that it accepted as undisputed, as supported by the administrative record, all facts properly set forth in defendant's *Memorandum In Support Of Summary Judgment Motion Or, In The Alternative For Judgment On The Record* (Doc. # 35) filed December 16, 1996. Finally, on February 19, 1997, the Court also sustained the *Motion In Limine* (Doc. # 51) which plaintiffs filed on January 30, 1997, thereby precluding defendant from introducing at trial the testimony of any witness who had testified at the administrative hearing, *i.e.* Fred Geer, Judy Thomasson, Thelma Dolginow, Beth Lee, Sandy White, Janise Steuve, Lynn Hayes and Dr. Rebecca Eilers.

■ These rulings, taken together, have the practical effect of limiting the summary judgment record to the administrative record which the parties developed before the Hearing Officer. None of the parties will be introducing further evidence at trial. The Court therefore finds that consistent with its duty to afford plaintiffs modified de novo review of the proceedings below, it shall construe defendant's motion for summary judgment as a motion for judgment on the record. Viewing the record in that light, the Court finds that the decision of the Hearing Officer should be and hereby is affirmed.

· Plaintiffs' complaints about the deficiencies in the hearing process, the bias of the hearing officer, their inability to call additional witnesses, and so forth and so forth and so on, have no bearing on the outcome of this case. This is true for two reasons.

First, the Court is conducting modified de novo review of the evidence at the administrative level, and. it will not be influenced by the facts (if they be facts) that the hearing officer made disparaging facial gestures, permitted defendant to ask questions encompassing the law without allowing plaintiffs to do so, harassed plaintiffs by insisting that they employ local counsel, permitted defendant to raise substantive issues and denied plaintiffs the opportunity to examine the witnesses on those issues, disregarded authoritative pronouncements of the Office of Special Education Programs ("SEP") of the United States Department of Education, improperly assigned plaintiffs the burden of proof, or contradicted the manifest weight of the evidence.

Second, any argument that the Hearing Officer terminated the proceeding without hearing all of plaintiffs' case, favored defendant in ruling on objections and other evidentiary issues, asked leading questions of witnesses and thus became an advocate for the

school district, and prevented plaintiffs from calling important witnesses is now beside the point. Plaintiffs had an opportunity to cure any deficiencies in the administrative record by offering additional evidence in the district court, under 20 U.S.C. § 1415(e)(2). Plaintiffs forfeited that right, however, under the Court's rulings of February 19, 1997. Accordingly, the Court is not concerned with plaintiffs' complaints in this regard.[1]

## I. FACTS

Having independently reviewed the evidence from the lengthy administrative hearing in this case, the Court finds that the factual findings of the Hearing Officer are more than substantially supported by the record. Highly summarized, the relevant facts are as follows:

Educators for hearing impaired children are presently divided into competing methodological camps. The goal of the "total communications" methodology is to help students achieve required *academic levels;* to this end it employs "total communication," *i.e.* both speech and sign language. Any communication is acceptable and any response by a student is acknowledged. The goal of the "oral communications" methodology, on the other hand, is to help the student acquire *intelligible speech.* This approach forbids the child from using any sign language and insists that all communication be verbal.

Noah Logue, who is now eight years of age, was born August 29, 1988. At the age of 22 months, he was diagnosed with a severe bilateral hearing loss. In 1991, he attended a "total communication" preschool at Children's Mercy Hospital in Kansas City, Missouri. The Logues moved to the Shawnee Mission School District in September of 1991,

and Mrs. Logue referred Noah to the District's hearing impaired preschool program. On September 16, 1991, the District held a meeting to formulate Noah's IEP. At that time, Noah was using a "total communication system" and according to his mother, that was his preferred mode of communication. Mrs. Logue said that she would appreciate more work in the oral communication area but that within three years (by age six) she expected Noah to be "fluent in signing" and have "good basic oral skills." Noah's parents participated in the meeting and consented to the IEP which placed Noah in a self-contained hearing impaired preschool which utilized the "total communications" approach.

The school district held annual IEP meetings in October of 1991, 1992 and 1993 which produced similar IEPs for Noah, based on the "total communications" approach—which the Logues did not challenge. They were generally pleased with Noah's placement and progress and worked closely with his preschool teacher. Throughout the years, Noah's vocabulary increased, his mean length of utterance increased and his speech and articulation increased.

On June 27 and 28, 1994, the Logues took Noah to St. Louis, Missouri, for testing at the Central Institute for the Deaf ("CID"), a private institute that taught students according to the "oral communications" method. CID completed a battery of tests to evaluate Noah's hearing, intellectual and communication abilities. It concluded as follows:

> Noah is a 5 year, 10 month old profoundly hearing-impaired child with excellent speech perception skills. His nonverbal intellectual abilities are within the average range. Noah's language skills are above

---

1. Having said that, the Court is compelled to observe that plaintiffs' lead counsel has alleged bias and/or sought to disqualify every administrative hearing officer, administrative reviewing officer and judge who has had any contact with this case, on the ground that each one is biased against him and thus, by association, his clients. Having reviewed this record in its entirety, the Court discerns no evidence of bias toward the Logues or, for that matter, toward their counsel. The record in this Court and in the administrative proceeding reveals, however, that plaintiffs' counsel is unable or unwilling to comply with standing rules and orders of the Court, not infrequently at the expense of his clients; is ob-

noxious, disrespectful and rude to judicial and administrative officers, opposing counsel and witnesses; and is highly resistant to reasonable rules of judicial decorum and orderly evidentiary proceedings. Any issues in this regard are ultimately ones to be resolved between plaintiffs, who selected their attorney, and the attorney himself. The Court finds no record support, however, for any insinuation that the outcome in this case flows from bias on the part of the three individuals who have independently evaluated plaintiffs' claims. Moreover, any blame for any failure to properly develop the record lies squarely with plaintiffs' counsel and not elsewhere.

the average range when compared with hearing-impaired children his age. * * * Noah, his family and his teachers should be proud of the listening, language and speech skills he has developed.

CID made the following recommendations for future placement:

1. Noah is in need of continued full-time special education as a hearing-impaired child with children of similar age and ability.

2. If the development of spoken language as a primary means of communication is a goal for Noah, he will likely require full-time intensive instruction in an oral program focusing on the development of auditory skills, lipreading and speech. Such placement would mean that mainstream placement is a future goal and an oral program would thus be appropriate for meeting Noah's educational needs.

Shortly after the CID evaluation, on July 19, 1994, the Logues met with Mary Conlan, District Director of Special Education for the Shawnee Mission School District. They gave her a copy of the CID evaluation and let her know that they wanted a program for Noah which focused on the development of oral language rather than "total communication" because they believed Noah should utilize an oral approach that would not include sign language. The Shawnee Mission School District did not have an "oral communications" program for hearing impaired students, however, at that time.[2] Moreover, Mrs. Conlan advised that the Logues' request would need to be discussed at an IEP meeting. Noah was due for his three year reevaluation in September but at the Logues' request, Mrs. Conlan agreed that she would try to arrange an IEP meeting at an earlier date.

Mrs. Conlan was able to schedule an IEP meeting for August 16, 1994.[3] Because Noah had just been tested at CID, the district agreed to use the CID test results, as supplemented by district tests on speech, language, and academics, as a basis for the IEP meet-ing. Defendant completed those tests on August 15, 1994, and the IEP meeting occurred the following day with the following individuals in attendance: Fred Geer, school psychologist; Janise Stueve, Noah's speech and language pathologist; Beth Lee, Noah's hearing impaired kindergarten teacher; Sandy White, Noah's audiologist; Mary Conlan, the Director of Special Education for the Shawnee Mission School District; Michael Culp, the principal of Noah's home school, Corinth Elementary; Diane Feeley, the principal of Santa Fe Trail School (which housed the hearing impaired preschool and kindergarten classes); Judy Thomasson, learning specialist; the Logues; and Sally Ruemmler, a friend of the Logues and a parent of a recent CID graduate.[4] The group discussed a range of options, including placement in a language-delayed self-contained classroom, inclusion at Santa Fe Trail, and inclusion at Corinth Elementary, Noah's home school. The Logues agreed with district staff that these options should be rejected. The group also discussed the options of placement at CID (which the Logues strongly advocated until such time as the Shawnee Mission School District developed an "oral educational program for Noah with children of similar age and ability," and which the school district rejected as being too restrictive an environment for Noah's educational needs) and placement in a self-contained hearing impaired classroom using "total communications" methodology (which the district proposed as the appropriate placement, and which the Logues rejected because they wanted Noah to be educated through exclusively oral methods). The district's proposal called for education in a self-contained hearing impaired classroom; mainstreamed time in a regular classroom for social studies, science, physical education, and music, and regular education activities such as recess, lunch and kindergarten centers; and extended time for speech, language and auditory training. The Logues rejected this place-

---

2. An oral communications program for hearing impaired students in the district had been terminated at some time before 1994.

3. In order to expedite the meeting, Noah's speech, language and auditory teachers, his hearing impaired kindergarten teacher, and the Dis-trict's special education evaluators agreed to convene before the beginning of their school year employment contract, during the summer recess.

4. Ms. Ruemmler had referred the Logues to CID for Noah's evaluation in June of 1994.

ment and on August 22, 1994, notified the school district that Noah would be enrolling at CID for the 1994–95 school year. They requested another IEP meeting to seek "a decision that Noah can live with," but reiterated that "until the staff develops an appropriate oral program for Noah within the district, we will place him at CID because oral methodology is what Noah needs and deserves at this time," and that "[i]f the staff proposal for Noah's educational plan is anything less than an oral program with trained professionals in the oral method, and with peers of similar age and abilities, it will not be accepted."

On September 28, 1994, the district held a second IEP meeting, attended again by Mr. Geer, school psychologist; Ms. Stueve, Noah's speech and language pathologist; Ms. Lee, Noah's hearing impaired kindergarten teacher; Ms. White, Noah's audiologist; Ms. Conlan, the Director of Special Education for the Shawnee Mission School District; Ms. Feeley, the principal of Santa Fe Trail School (which housed the hearing impaired preschool and kindergarten classes); Ms. Thomasson, learning specialist; and Mr. Logue.[5] The District also brought in outside resource people: Kathy Colantuono, a social worker, and Dr. Lynn Hayes of the University of Kansas Medical Center's Deaf Education program, who was familiar with both the "oral communication" and "total communication" methods of education and attended to answer questions that might arise. Noah's grandmother and great-grandfather also attended the meeting.

At the meeting on September 28, the Logues did not present additional information about the placement options at CID. The district rejected the Logues' request for placement at CID as being too restrictive for Noah's needs, but it responded to the family's request for more training in speech areas by agreeing to increase Noah's time with the speech and language pathologist to 150 minutes per week, and his time with the audiologist to 120 minutes per week. The family did not agree to this program and shortly thereafter, they commenced the due process procedure before the Hearing Officer. Ex-

hibit 35 is the IEP proposal dated September 28, 1994, which is the subject of this review.

The program offered to Noah Logue was appropriate and reasonably calculated to produce educational benefit for Noah. Ms. Lee, Noah's hearing impaired kindergarten teacher, favored the self-contained hearing impaired classroom over the CID option for Noah for these reasons:

> I feel ... that Noah would benefit from that program. He could learn orally in my class. He would also maybe be learning some signs, ... but I feel like the signs help the speech, augment the understanding and the communication process. It seemed that Noah was a student who was able to learn and was ready to really begin doing a lot of good academic, strong work. And so that's the way I perceived him. And I thought he would just have a great time. He knew the students and he was good friends with them, and I looked forward to a great year with him being in there.

*Testimony of Beth Lee* (Hearing Vol. 3 at 604, February 23, 1995). Ms. Thelma Dolginow, Noah's hearing impaired preschool teacher from 1991 through May of 1994, agreed that Ms. Lee's self-contained hearing impaired classroom was an appropriate placement for Noah. *Testimony of Thelma Dolginow* (Hearing Vol. 4 at 884, February 24, 1995). Ms. Thomasson, the learning specialist, believed that proposed IEP had been correctly completed and that it offered an appropriate education to Noah. *Testimony of Judy Thomasson* (Hearing Vol. 5 at 1164, March 6, 1995). Ms. Stueve, Noah's speech and language pathologist, testified after participating in the IEP meetings on August 16 and September 28, 1994, that both proposed IEPs were reasonably calculated to provide Noah an educational benefit commensurate with his capacities and abilities. *Testimony of Janise Stueve* (Hearing Vol. 9 at 1865, March 30, 1995). Rebecca E. Eilers, a Ph.D. in educational and developmental psychology and a professor of psychology, pediatrics and otolaryngology at the University of Miami, testified for the Shawnee Mission School District that the September 1994 IEP offered an

---

**5.** Mrs. Logue was apparently residing with Noah   in St. Louis.

educational program that was "appropriate for Noah in every respect." *Testimony of Rebecca E. Eilers* (Hearing Vol. 11 at 2116, May 10, 1995). She amplified her views in the following words:

> ... judging from where Noah was when he came into the program and where he was at the end of the '94 school year, I would say he made a great deal of progress. If you look at his test scores compared to national norms for hearing impaired children, his test scores are excellent, fight at the top of test possibilities, the 85, 90 percent range, which tells me that he's doing very well in this program compared to other hearing impaired children, and that up to this point the program must be doing something very good for him, for him to have achieved that level of mastery of the material. * * * ... for a child like Noah, it's important that he have the sign support, because it often is easier for a child to pay attention when there are multiple sources of information available than when there's simply a single source that's a very difficult source for him to understand.
>
> So, with a typical hearing impaired child, learning speech is a long and arduous process that takes many, many years. Learning language through sign is usually a much shorter process and provides quite a bit of support. I would be loath to take that away from a child who's doing well using it.

*Testimony of Rebecca E. Eilers* (Hearing Vol. 11 at 2116, 2177, 2188, May 10, 1995).

Plaintiffs' own experts agreed that Noah would receive educational benefit from the IEP proposed in September, 1994. Denise Wray, a Ph.D. with an emphasis in special education who testified as an expert for plaintiffs, testified that the IEP proposed on September 28 did not sufficiently challenge Noah but that if it were adopted, Noah would get "some educational benefit" from it. *Testimony of Denise Wray* (Hearing Vol. 8 at 1529, March 29, 1995). Jean Moog, principal of the school and director of deaf education at CID and associate professor of speech and hearing at Washington University, also testified as an expert for plaintiffs that while Noah had the ability to achieve more than was stated in the IEP proposed on September 28, that IEP "was designed to produce some benefit and some learning for him." *Testimony of Jean Moog* (Hearing Vol. 9 at 1712, 1713, March 30, 1995).

## II. ANALYSIS

### A. Plaintiffs' claim that the IEP lacked the content required by K.A.R. § 91–12–41(f) and 34 C.F.R. § 300.346

After they terminated the meeting process within the Shawnee Mission School District, plaintiffs launched a vacillating but ultimately unavailing and trivial attack on the format of the IEP which defendant proposed in this case.[6] In their administrative hearing brief, plaintiffs claimed that the IEP did not conform with K.A.R. § 91–12–41(f)(1)–(7) because it was not sufficiently detailed and was not authored by an appropriate IEP team. On appeal to the State Level Review Officer, plaintiffs claimed that the IEP was defective because it vaguely stated the goals and present levels of functioning, and because the IEP team that wrote it was not properly constituted. In the complaint filed in this case, plaintiffs complained that the IEP did not consider placement at CID as an option. In plaintiffs' answers to interrogatories, which generally consisted of more than 50 pages of argument, plaintiffs faulted the IEP because it did not comply with K.A.R. 91–12–41(f)(1)–(4), in that its statement of annual goals was too general, its statement of present levels of functioning was too broad, and its assessments of Noah were inadequate.

---

6. The IEP is by no means a trivial document and weighty educational considerations underlie each of the substantive requirements established in K.A.R. § 91–12–41(f) and 34 C.F.R. § 300.346. The Court characterizes plaintiffs' attack on the IEP as trivial because it appears to be a makeweight, after-the-fact effort to subvert the IEP process. Throughout the IEP process, the Logues' complaint was that their son needed and deserved an exclusively oral method of instruction with students of similar ages and abilities—and they made it clear that "anything less" would be unacceptable. The Logues voiced no objection to the SEP, and the alleged deficiencies in the IEP were absolutely immaterial to their methodological dispute with the Shawnee Mission School District.

■ The sufficiency of the IEP is a question of law for the Court.[7]

### 1. Compliance with K.A.R. § 91–12–41(f)(1)–(4).

Plaintiffs allege that the IEP does not comply with K.A.R. § 91–12–41(f)(1)–(4), which requires that certain items be included in a student IEP.[8] The Court finds that the District complied with all of the Kansas Administrative Regulations, however, as more fully set forth below.

#### a. Present Levels of Performance

■ K.A.R. § 91–12–41(f)(1) provides that a child's IEP shall contain:

A statement of the child's present level of educational performance. The statement shall include, as appropriate, health, vision, hearing, social and emotional status, general intelligence, educational performance, communicative status, motor abilities and vocational skills.

In Noah's case, the IEP included appropriate information regarding his educational performance. It noted his academic achievement, social adaptation, pre-vocational skills, sensory and motor skills, self-help skills, speech and language skills, and vision and hearing.

Plaintiffs argue that the IEP too broadly describes Noah's present levels of functioning. Their attack on the use of "broad descriptors," however, is misplaced. The levels stated in Noah's SEP, in areas pertaining to his disability, were very specific. The law does not require any more specific statement of his present levels of educational performance. *See* 34 C.F.R. § 300.346(a)(1).

■ Plaintiffs also argue that the IEP's description of Noah's present level of educational performance was based on an inadequate assessment of his abilities. Again, the argument lacks merit. Federal regulations provide that evaluations are to be "administered by trained personnel in conformance with instructions provided by their producer." 34 C.F.R. § 300.532(a)(3). They also require that evaluations be conducted by a "multidisciplinary team or group of persons, including at least one teacher or other specialist with knowledge in the area of suspected disability." 34 C.F.R. § 300.532(e). In this case, Noah was evaluated on hearing, hearing aids, speech, language, intelligence, and educational aspects, and was assessed in all areas related to the suspected disability, by a multi-disciplinary team which possessed the requisite skills. The evaluation complied with applicable law.

The record does not reveal that the alleged defects in Noah's IEP compromised the proposed educational program or the Logues' participation in the IEP process. The Logues were knowledgeable and well informed about Noah's strengths, weaknesses and current levels of performance. Plaintiffs have not shown that the District failed to meet any requirements regarding assessments or present levels of functioning imposed by K.A.R. § 91–12–41(t)(1) or 34 C.F.R. § 300.346(a)(1).

#### b. Statement of annual goals

■ K.A.R. § 91–12–41(f)(2) provides that the IEP shall contain "a statement of annual

---

7. Plaintiffs raise additional issues which they did not properly preserve for review because they did not raise them during the IEP meetings, during the due process hearing or during the State Level Review. IDEA mandates that a party exhaust administrative remedies. *Urban v. Jefferson County Sch. Dist. R–1,* 89 F.3d 720, 724 (10th Cir.1996). Absent special circumstances not present here, a party's failure to raise issues will bar their determination on review. *Id.; see also Bonnie Ann F. v. Calallen Indep. Sch. Dist.,* 835 F.Supp. 340, 350 (S.D.Tex.1993) *aff'd* 40 F.3d 386, *cert. denied* —— U.S. ——, 115 S.Ct. 1796, 131 L.Ed.2d 723 (1995).

8. The Kansas regulations, although more detailed, track federal regulations found at 34 C.F.R. § 300.346. The federal regulations provide as follows:

(a) *General.* The IEP for each child must include—

(1) A statement of the child's present levels of educational performance;

(2) A statement of annual goals, including short-term instructional objectives;

(3) A statement of the specific special education and related services to be provided to the child and the extent that the child will be able to participate in regular educational programs;

(4) The projected dates for initiation of services and the anticipated duration of the services; and

(5) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether the short term instructional objectives are being achieved.

goals which describe the educational performance anticipated within a year's time." *See also* 34 C.F.R. § 300.346(a)(2). Plaintiffs argue that the stated goals were too general in nature. Noah's IEP shows six annual goals which describe the educational performance anticipated for Noah within a year's time. Plaintiffs cite no legal authority which supports their position,[9] and the Court finds that the IEP sufficiently meets the requirements of K.A.R. § 91–12–41(f)(2).

### c. Short Term Objectives

██ K.A.R. § 91–12–41(f)(3) provides that the IEP shall contain "a statement of short-term objectives which are measurable, and intermediate steps between the present level of performance and the annual goals." *See also* 34 C.F.R. § 300.346(a)(2)–(5). Noah's IEP contains five pages of short-term objectives. Each objective is specifically keyed to one of the above six goals. Moreover, each short term objective is a measurable, intermediate step toward the goal stated.

K.A.R. § 91–12–41(f)(4) requires that each IEP contain "objective criteria, evaluation procedures, and data collection schedules for determining at least every 12 weeks, whether the short-term objectives are being achieved." Again, this information is included in Noah's IEP. Each short term objective contains the objective criteria and evaluation procedure to determine whether the objective is being met. For instance, short term objective "1a" states that "Noah will label new vocabulary orally with 90% accuracy over 2 consecutive sessions for 6 sets of 10 words." The objective criteria is plainly stated and the evaluation procedure noted. Additionally, each objective is calendared for review and record every twelve weeks The objectives meet the applicable regulations and, again, the record reveals no showing of any prejudice to Noah or his parents.

While plaintiffs challenge these aspects of the IEP, their complaints were not presented for review by the State Level Review Officer.

Even if plaintiffs had properly preserved their arguments on this issue, the Court would find that their position is without merit.

██ To the extent plaintiffs claim that the District violated any procedural duties in developing the IEP the Court finds no evidence in the record that the District failed to do so. Even if a procedural violation had occurred, however, plaintiffs would not automatically be entitled to relief. Procedural flaws "do not automatically render an IEP legally defective." *Roland M.,* 910 F.2d at 994 (citing *Doe v. Defendant I,* 898 F.2d 1186, 1191 (6th Cir.1990)); *Urban,* 89 F.3d 720, 726 (10th Cir.1996). Instead, "there must be some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits." *Roland M.,* 910 F.2d at 994. The burden of making such a showing remains on the party who challenges the IEP. *Id.* at 995.

██ If a procedural violation does not cause prejudice, the tribunal should deny relief *Thomas,* 918 F.2d at 625 (failure to comply with written notice requirements does not entitle plaintiffs to reimbursement when such failure did not prejudice plaintiffs). The Court should not "exalt form over substance." *Doe v. Defendant I,* 898 F.2d at 1190. Plaintiffs fail to demonstrate any prejudicial non-compliance with IEP procedural requirements. Moreover, the record reveals no prejudice to either the parents or the student on account of any technical deficiency in the procedures which the school district followed.

**B. Plaintiffs' claim that the IEP proposed in September of 1994 denied Noah "educational benefits in accordance with [his] abilities and capacities," as allegedly required by K.S.A. § 72–962.**

██ Plaintiffs do not deny and in candor cannot deny that in 1994, the Shawnee Mis-

---

**9.** Plaintiffs' authority actually contradicts their position. *See Board of Educ. of the Casadaga Valley Cent. Sch. Dist.,* 20 IDELR 1023 (1994)(state review officer found annual goals stated in somewhat general terms, but more specific statement of short-term objectives was sufficient to set general direction to be taken by those implementing IEP).

sion School District offered Noah an IEP which was reasonably calculated to afford him substantial educational benefit. The vast wealth of the evidence before the Hearing Officer showed that Noah had been progressing in his Shawnee Mission program and that further progress could be expected under the proposed plan. Two of plaintiffs' own experts testified that the IEP proposed on September 28 would have afforded Noah educational benefits. The IEP thus met the substance requirement of the IDEA. *Cain v. Yukon Pub. Schs. Dist. I–27,* 775 F.2d 15, 21 (10th Cir.1985); *Rowley,* 458 U.S. at 206–207, 102 S.Ct. at 3050–3051.

■ Plaintiffs contend that the State of Kansas has bound itself to a higher standard than that required by federal law. In making this argument, they exclusively rely upon K.S.A. § 72–962(f)(2), which does not—by its terms—bind the State of Kansas to anything at all. K.S.A. § 72–962(f)(2) merely defines "exceptional children." It defines them as children who "differ in physical, mental, social, emotional or educational characteristics to the extent that special education services are necessary to enable them to receive educational benefits in accordance with their abilities or capacities." Clearly, this definition does not require public schools to provide any given level of educational service. That function is discharged by K.S.A. § 72–966(a), which obligates each school district to provide "special education services" for all exceptional children who are residents thereof.[10] "Special education services" are defined in K.S.A. § 72–963(h) as "programs for which specialized training, instruction, programming techniques, facilities and equipment may be needed for the education of exceptional children." Plaintiffs do not argue that the Shawnee Mission School District failed to provide programs of this nature, and they have not established that the education which defendant offered Noah in 1994 violated the Special Education For Exceptional Children Act, K.S.A. § 72–961 *et seq.*

■ Plaintiffs' argument to the contrary is legally frivolous, for the Act reveals no legislative intent to adopt a different—let alone a higher—standard than that imposed by IDEA. To prevail, plaintiffs must bring forward "hard evidence" that the legislature intended to impose a higher standard. *Doe v. Bd. of Educ.,* 9 F.3d at 458. Such evidence is missing in this case. Before 1994, K.S.A. § 72–962(f)(2) defined "exceptional children" as those who differ in physical, mental, social, emotional or educational characteristics "to the extent that special education services are necessary to enable them to *progress toward the maximum of their abilities or capacities*" (emphasis supplied), as opposed to the current definition, *i.e.* children for whom special education services are necessary to enable them to *receive educational benefits in accordance with their abilities or capacities.* Kansas amended the definition in 1994. 1994 Kan. Sess. Laws, Ch. 307, p. 1754. While the purpose of the amendment is not clear, the amended definition parallels the *Rowley* standard, which requires the state to provide a program "reasonably calculated to enable the child to receive educational benefits." 458 U.S. at 207, 102 S.Ct. at 3051. If the 1994 amendment reveals any evidence about the legislature's intent on this issue, it does not reveal hard evidence that the State of Kansas intended to bind itself to a higher standard.

### III. CONCLUSION

■ Whether the evidence is viewed from a standard of deferential review, modified de novo review, or strictly de novo review, the conclusion is the same: the IEP which the Shawnee Mission School District proposed in September of 1994 was reasonably calculated to provide Noah an educational benefit which would allow him to progress in school according to his abilities and capacities. The record is equally clear that the Logues are responsible, conscientious advocates for Noah. They and the school district stand in opposing camps in the methodological battleground between the "oral communications" method and the "total communications" method of teaching this particular child. On this record, however, it is clear

---

10. K.S.A. § 72–966(c) also states that the special education services required by K.S.A. § 72–966(a) shall meet standards ad criteria set by the State Board of Education. Plaintiffs do not claim, however, that the educational program which defendant proposed for Noah violated any standard or criteria established by the State Board of Education.

that the "total communications" methodology is an accepted, proven methodology for educating profoundly hearing impaired children in general and Noah Logue, in particular. Parents—no matter how well motivated—do not have a right under IDEA to compel the school district to provide a specific program or employ a specific methodology for the education of their disabled child. *Lachman v. Illinois Bd. of Educ.*, 852 F.2d 290, 297 (7th Cir.1988) *cert. denied* 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 327. Moreover, schools do not have to provide services to "maximize each child's potential." *Rowley*, 458 U.S. at 198, 102 S.Ct. at 3046. Thus the issue is not whether CID is better, but whether the District offered an appropriate education. *See Doe v. Bd. of Educ.*, 9 F.3d at 459–60 (the Act requires the equivalent of a "serviceable Chevrolet" for all disabled children, not a Cadillac for the individual). A child who receives and benefits from his personalized instruction is entitled to no more under the IDEA. *Urban*, 89 F.3d at 720.

For all of the foregoing reasons, because the evidence shows that the IEP proposed for Noah in September, 1994 was correctly formulated and reasonably calculated to confer an educational benefit, the Court grants judgment in favor of Shawnee Mission School District, U.S.D. No. 512.

**IT IS THEREFORE ORDERED** that defendant's *Motion For Summary Judgment Or, In The Alternative For Judgment On The Record* (Doc. # 34) filed December 16, 1996 be and hereby is sustained, and that the Clerk enter judgment affirming the decision of the Hearing Officer in this case.